**Opinion issued December 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00584-CV

_____

**STEPHANIE MONTAGNE ZOANNI, Appellant**

**V.**

**LEMUEL DAVID HOGAN, Appellee**

---

**On Appeal from the 246th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-34811-B**

---

## OPINION ON REHEARING

Appellant Stephanie Montagne Zoanni moved for rehearing of our December

28, 2023 opinion and judgment. We deny the motion for rehearing, withdraw our

opinion and judgment of December 28, 2023, and issue this opinion and judgment in their stead. Our disposition remains the same.[1]

Zoanni challenges the final judgment rendered on a jury verdict in favor of her ex-husband, Appellee Lemuel David Hogan, on his defamation claim. The jury found Zoanni made thirteen defamatory statements about Hogan, and it awarded Hogan damages for past and future injury to his reputation and past and future mental anguish. The jury also found Zoanni made the statements with malice but it awarded no punitive damages.

Zoanni raises five issues on appeal. In her first issue, Zoanni argues that because Hogan failed to comply with the Defamation Mitigation Act for nine of the thirteen alleged defamatory statements, this Court should reverse and render in her favor as to those nine statements. In *Zoanni I*,[2] this Court sustained Zoanni's first issue. We reversed and rendered judgment that Hogan take nothing on his defamation claim based on the nine statements, and we remanded for a new trial on the remaining four statements. The Texas Supreme Court reversed the holding of this Court in *Zoanni I*, holding the Defamation Mitigation Act did not support a right

---

[1]     All pending motions are denied as moot.

[2]     *Zoanni v. Hogan*, 555 S.W.3d 321 (Tex. App.—Houston [1st Dist.] 2018), *rev'd and remanded*, *Hogan v. Zoanni*, 627 S.W.3d 163 (Tex. 2021) ("*Zoanni I*").

of dismissal. The Supreme Court reversed and remanded for this Court to consider Zoanni's remaining issues on appeal.[3]

In her four remaining issues on remand, Zoanni argues that (1) with respect to damages, the trial court erroneously failed to submit an instruction on mitigation of damages, there is legally or factually insufficient evidence to support the award of damages, the damage award is "manifestly too large," and the award impermissibly includes punitive damages, (2) part of the judgment improperly penalizes Zoanni for her opinions, (3) there is legally insufficient evidence that Zoanni published certain police report statements, and (4) the trial court erroneously excluded testimony based on the clergy privilege.

We affirm the trial court's judgment.

## Background[4, 5]

Appellee Lemuel David Hogan is an executive pastor at the Spring First Church in Spring, Texas ("Church"). He and Appellant Stephanie Montagne Zoanni

---

[3] *Hogan v. Zoanni*, 627 S.W.3d 163 (Tex. 2021).

[4] This section is largely an amalgamation of this Court's opinion in *Zoanni I* and the Texas Supreme Court's opinion in *Hogan v. Zoanni*, 627 S.W.3d 163 (Tex. 2021).

[5] Zoanni's brief does not comply with the Texas Rules of Appellate Procedure. Her brief does not contain a statement of facts. She also fails to refer to specific record cites when addressing some of her appellate issues. *See* Tex. R. App. P. 38.1(g), (i) (requiring appellant's brief to contain statement of facts and clear and concise argument with appropriate citations to authorities and record). To the extent possible, we have addressed the merits of Zoanni's arguments. *See Salazar v. Sanders*, 440 S.W.3d 863, 872 (Tex. App—El Paso 2013, pet. denied) ("Appellate

3

met at the Church and they married in January 2004. In 2011, they divorced.[6] The trial court signed an Agreed Final Decree of Divorce naming Hogan and Zoanni as joint managing conservators of Mary, their daughter.[7] This appeal stems from the parties' post-divorce suit to modify custody of their daughter.

## The Filed Lawsuit

In March 2014, Hogan filed a petition to modify the parent-child relationship. As part of his petition, Hogan asserted claims against Zoanni for defamation, invasion of privacy, malicious prosecution, abuse of process, and intentional infliction of emotional distress. Hogan also requested injunctive relief in the form of a permanent injunction enjoining Zoanni from communicating with third parties about him.[8] He alleged that beginning in July 2013, Zoanni started making false

---

courts are required to construe briefs reasonably, yet liberally, so that the right to appellate review is not lost by waiver, and in so doing, we should reach the merits of an appeal whenever reasonably possible. At the same time, an appellate court should not make the appellant's argument for him because the court would be abandoning its role as a neutral adjudicator and would become an advocate for the appellant.") (internal citation omitted).

[6] During her marriage to Hogan, Appellant went by the name of Stephanie Montagne Hogan. After the parties divorced, Appellant remarried Rick Zoanni and she currently goes by the name of Stephanie Montagne Zoanni. We refer to Appellant in the opinion as "Zoanni."

[7] We refer to Zoanni's and Hogan's daughter using a pseudonym to protect her identity.

[8] Zoanni filed a counter-petition. Spring First Church and Hogan's parents, Robert and Brenda Hogan, also intervened in the suit seeking a money judgment against Zoanni for various claims of defamation related to the allegations in Hogan's petition. The trial court dismissed the claims in intervention on summary judgment.

statements about him, claiming he is "a child molester, [a] pervert, [and a] pedophile." He alleged that Zoanni falsely represented to third parties, including Child Protective Services ("CPS") and law enforcement officers, that he was "abusing" their daughter Mary, and that he "is a child molester, involved with child pornography, and otherwise is of poor character and mistreats women and children." Hogan alleged that Zoanni made these and other similar statements online, to CPS, and in written communications to Hogan's church leadership. In support of his defamation claim, Hogan identified four alleged defamatory statements made by Zoanni.

The trial court severed Hogan's tort claims against Zoanni from the matters involving custody of Mary. The trial court granted summary judgment in favor of Zoanni on Hogan's abuse of process and malicious prosecution claims, leaving only the claims for invasion of privacy, intentional infliction of emotional distress, and defamation for trial. Ten days before trial began, Hogan filed a Seventh Amended Petition, dropping all remaining tort claims against Zoanni except his defamation claim. In his amended petition, Hogan alleged that Zoanni had made nine additional defamatory statements about him, some to a police officer at Harris County Constable Precinct 4, others in email and written communications, and others online.

---

Neither Zoanni's cross-petition nor the claims in intervention are relevant to the present appeal.

The case proceeded to trial on Hogan's defamation claim based on thirteen alleged defamatory statements. The jury found that all thirteen statements were false when made by Zoanni. The jury found that six of the statements were defamatory, and for the rest, it found that Zoanni knew or should have known, in the exercise of ordinary care, that the statements were false and had the potential to be defamatory.

The thirteen statements were separated and presented to the jury in two separate parts in the damages portion of the jury charge. Question 10 Part A listed eight statements and Question 10 Part B listed the remaining five statements. The jury awarded Hogan $900,000 in compensatory damages for the statements in Question 10 Part A consisting of (1) $600,000 for past and future damage to his reputation, and (2) $300,000 for past and future mental anguish. And it awarded Hogan $1,200,000 in compensatory damages for the statements in Question 10 Part B consisting of (1) $850,000 for past and future damage to his reputation, and (2) $350,000 for past and future mental anguish. The jury also found that the statements were made with malice but awarded no exemplary damages.

The trial court rendered judgment based on the jury's verdict awarding Hogan $2,100,000 in compensatory damages. Zoanni filed a motion for new trial, which the trial court denied.

This appeal ensued.

6

**Testimony During the Trial**

A.    **Deputy Kelly Nelson**

Deputy Kelly Nelson with the Harris County Constable's office testified that she met with Zoanni in July 2013, when Zoanni and her sister, Sarah Montagne, went to the police station to file a report against Hogan. According to Deputy Nelson, Zoanni made "allegations of child porn, [and] sexual assault." When asked who Zoanni claimed was "involved in child porn," Deputy Nelson testified, "There were a couple of names mentioned. One of them was a little girl named [Mary]."

Deputy Nelson clarified that Mary was mentioned in her police report, but not with respect to child pornography. When asked what Zoanni told her about child pornography, Deputy Nelson testified, "According to the report that she—she knows that there's child pornography going on with [Hogan]." According to Deputy Nelson, Zoanni stated that she "strongly" believed there was child pornography occurring.

Zoanni also told Deputy Nelson that she felt Mary may have been sexually assaulted by Hogan and Mary was afraid to speak up. Zoanni also made allegations about "Hogan having cameras in air vents." Deputy Nelson testified that Zoanni's sister, Sarah, was present when Zoanni spoke to her. Deputy Nelson's police report was admitted at trial as Plaintiff's Exhibit 4 and Defendant's Exhibit 21.

When asked on cross examination, Deputy Nelson testified she was not aware Zoanni had concerns about the accuracy of her report.

**B.      Dr. Joseph Edralin**

Dr. Joseph Edralin, Mary's former pediatrician, testified next. Dr. Edralin testified that Zoanni and her mother Linda Montagne came to his office in January 2014. He and Zoanni discussed "whether or not [Hogan] was fit to be a parent because of allegations of pornography." When asked to describe these allegations, Dr. Edralin testified, "Pornography, of [Hogan] viewing pornography, and of possibly observing inappropriately other girls, young girls." When asked "what kind of pornography" Zoanni "accused [Hogan] of observing," Dr. Edralin testified, "It was about children." Zoanni did not directly tell him she believed Hogan was watching child pornography, but according to Dr. Edralin, "it was implied." Dr. Edralin immediately became concerned when he heard Zoanni's allegations and testified that "if these allegations were true, [Mary] didn't need to be in that home and she wasn't safe." Dr. Edralin testified that before speaking to Zoanni, he had a good opinion of Hogan, but after Zoanni made these allegations, his opinion of Hogan changed for the worse.

In February 2014, Mary had an appointment with Dr. Edralin. Dr. Edralin insisted that Zoanni and Hogan attend, and he wanted Hogan and Zoanni to bring other family members with them to the appointment. He did this because "there was

concern about [Hogan's] fitness as a parent and I just did not want this and I've been through enough divorce cases where this becomes a he said, she said kind of situation and I just wanted as many people in that room as possible to take care of [Mary] to know how this is going to be." Zoanni brought her mother Linda and Hogan brought his mother, Brenda Hogan.

Dr. Edralin spoke to Mary privately and the only problem she reported was that Zoanni and her boyfriend spoke badly about Hogan. After talking to Mary, Dr. Edralin testified he had no concerns about Mary's relationship with Hogan. He then conducted Mary's physical examination in the presence of Zoanni, Hogan, Linda, and Brenda. According to Dr. Edralin, Zoanni was upset about the appointment.

Days after the appointment, Zoanni sent Dr. Edralin a letter firing him as Mary's pediatrician. The letter, which was admitted as Plaintiff's Exhibit 10, stated in part:

> [Mary] will no longer be a patient of STEP Pediatrics… And please, for the love of God, when you have been informed that a father is a pedophile and a pervert, do not encourage him to sit in on a meeting when you are discussing breasts and pubic hair!

On cross-examination, Dr. Edralin read additional portions from the letter. He testified that Zoanni did not talk to him about Hogan "putting a camera in someone else's room in an effort to spy on an adult couple having sex" or "removing a fan so he could look down through a vent into a guest bathroom to see naked young girls."

9

He testified, however, that he vaguely recalled Zoanni telling him about Hogan "confessing [about] spying on women or girls in a changing room at a store."

## C.    Stephanie Montagne Zoanni

Zoanni testified next.   Hogan's counsel played excerpts from Zoanni's deposition testimony for the direct examination portion of Zoanni's testimony.  On cross-examination, Zoanni was asked about her deposition testimony.

Zoanni testified that, in the fall of 2004, she and Hogan attended a minister's retreat in Corpus Christi, Texas.  They were sharing a condo with another couple, Kim and Pockets Tullos.  Zoanni and Hogan arrived at the retreat first.  At one point, before the Tulloses arrived, Zoanni got out of the bath to look for Hogan and she found him standing in the Tulloses' bedroom.  Zoanni testified:

> [H]e had his back to me and he was in the corner and there was an armoire, I guess, a TV and he had—there was fake foliage on top of the TV and he was standing up with his arms raised above his head and he was putting something in the plant and I just stood there.

> He didn't know that I was in the room yet and I just kind of stood there and watched him for a second and then I said, "What are you doing," and he whipped around real fast and I—he had the camera in his hand and he was like, "Oh, you know, I was playing a practical joke on Pockets and Kim.  I was playing a practical joke," and I said, "By planting a camera pointed at the bed in another adult's hotel room?"

> I'm like, "That's not a joke.  It's not funny."

Zoanni, who was "very upset" and "disgusted" by Hogan's behavior, believed that "maybe after he got caught that one time, that it wouldn't happen again. That's what I was thinking."

She testified about another incident in April 2005. According to Zoanni, she got out of bed late at night and found Hogan watching a Girls Gone Wild infomercial. She testified Hogan was "playing it in slow motion and then he would rewind it and play it again and rewind it and play it in slow motion and I just kind of watched him watching that" for "only two or three minutes because I couldn't stomach it." Zoanni "called [Hogan] a pervert and locked [her]self in the guest bedroom." Zoanni eventually came out and walked into the guest bathroom to compose herself. She decided to leave with Mary to stay at her parents' house. When she tried getting a suitcase from the attic, Zoanni testified Hogan

> jumped in front of me and he stood in an X in the doorway and started freaking out and panicking and he started crying and saying, "I'll tell you everything. I'll tell you. Just let's just talk about it," and he was panicking and refusing to let me into the garage.

According to Zoanni, Hogan told her that

> he had been struggling with pornography for a long time. He told me that he, a few months earlier, had noticed that the exhaust fan in the guest bathroom had broken. He used that bathroom a lot more than I did and he told me the fan had broken and he had gone up in a few months earlier to fix the fan and he said when he took the fan off of the ceiling grade or the exhaust grade, that he could see straight down into the bathroom, so he left the fan off of the grate so that he could go up into the attic and see whoever was in the bathroom.

11

. . .

> He told me that he had seen someone in the bathroom, that he had seen someone in the bathroom and that it was one of the girls that had stayed the night with us, I guess it was a few—maybe a few weeks earlier or maybe even earlier that week. They were in our youth group.

Zoanni testified she later learned that the girl Hogan saw in the bathroom was her then 14-year-old sister, Sarah. Zoanni found this out the morning after the Girls Gone Wild incident, when she and Hogan went to his parents' home. Zoanni testified that Hogan confessed to his parents, but she did not specify to what exactly Hogan confessed. Later that same day, Zoanni went to her parents' home, and she told her mother, Linda, what had happened.

According to Zoanni, Hogan was "ordered into counseling" by the Church. Zoanni was questioned about a July 18, 2005 letter written by Hogan, admitted as Defendant's Exhibit 1. In the letter, Hogan stated that over the past several months he had been "struggling with internet pornography" affecting his ability to minister effectively, and that he had confessed his problem to Zoanni and his Senior Pastor on May 10, 2005.

Zoanni testified she went with Hogan to Ohio where they received counseling from Ron Turner as part of Hogan's rehabilitation. During counseling, Hogan confessed to watching pornography on the church's computers and to an incident that occurred at a local costume store, Danny's Tricks and Kicks. According to Zoanni, Hogan reported that when he was at the store "he noticed that some of the

12

dressing room curtains, I guess, weren't closed all the way, so he could watch women changing clothes at Danny's Tricks and Kicks." Zoanni testified that Hogan watched the women change and when asked if he did "so to obtain a sexual thrill," Zoanni answered, "Yes." When asked about the type of pornography Hogan preferred to watch, Zoanni testified, "Voyeurism." According to Zoanni, that was "consistent with the other things that were being confessed and learned."

Zoanni and Hogan divorced in 2011, and she began making the alleged defamatory statements in July 2013. She testified that at the time, there were a "few things that caused [her] concern with some interactions that [Hogan] had had" with Mary and there were also a few other things involving "members of his family."

### 1.    2013 Police Report

Zoanni testified that she and her sister Sarah went to the police in July 2013 to file an informational report against Hogan. She denied telling Deputy Nelson that Hogan watched child pornography. According to Zoanni, she told Deputy Nelson about Hogan "planting the hidden camera in Corpus Christi," Hogan's admission that he was a "voyeur," and the incident with Sarah, which Zoanni described as Hogan going into the "attic and watching a child for his own sexual gratification." According to Zoanni, Deputy Nelson inquired whether she had seen any pictures or videos on any of Hogan's devices and she responded, "No."

13

Zoanni testified she did not see Deputy Nelson's written report until much later. She testified she was "really upset because it's just riddled with error." According to Zoanni, she called Officer Nelson several times to discuss the report's errors, but Officer Nelson never returned her calls. Zoanni, however, spoke to Detective Russell Ackley to correct the report's erroneous statements involving allegations of "child pornography."

### 2. Facebook Post - December 30, 2013

Zoanni was asked about a Facebook post she posted on December 30, 2013. In her post, Zoanni stated: "What a good dad DOES NOT do: He does not spy on young girls in his youth group going to the bathroom and getting into the shower through the bathroom air vent in his house (caught and admitted to)." When questioned about this statement, Zoanni explained she made a mistake when she said that Hogan was "caught and admitted to" the allegations. She testified:

> Well, I think the error was that I said that he was caught and admitted to. Doesn't film the young girls like we were talking about earlier. I knew in my heart that there was something, some reason why he wasn't letting me in there; but I shouldn't have put that I knew that he had done it or that he got caught and admitted to.

But she testified she still believed Hogan was filming her "little sister when she was 14 through the little air vent," based on:

> Well, I think it's a lot of reasons. One, because he confessed to the pornography problem. Another one being that he had confessed to spying on a young girl in the bathroom. Another one being that I had caught him trying to plant a hidden camera earlier, and another one

14

being the way that he physically blocked me from going in there to the stairs where the attic is.

According to Zoanni, she corrected her mistake on the Facebook post before Hogan requested that she do so.

In her Facebook post, which Zoanni also included in her blog, she implicitly accused Hogan of engaging in the following conduct:

What a good dad DOES NOT do: . . .

* He doesn't watch porn at the church office

* He doesn't get removed from his position supervising youth just to be added back into a children's supervisor role a year later by his parents who he also confessed to

* He doesn't get banned from carrying a camera on the elementary school property

* He doesn't call sex hot lines so much that he has the number memorized or on speed dial

* He doesn't take her BRA shopping just after her 9th birthday and worse it's never HIS IDEA and he doesn't pick out padded bras for her to try on! (And his mom encouraged him to take her???)

* He doesn't stalk his ex-wife's boyfriend[']s MOTHER sending her messages on FB

* He doesn't ask [his daughter] to lick his neck

Zoanni testified that she never used the words "child porn" in her blog.

15

### 3. Statements to Dr. Edralin and Pastor Barker

Zoanni testified about her interactions with Dr. Edralin, beginning with the time she and her mother visited his office to discuss Mary's bronchitis. She testified in part:

> We had started talking about some concerns that we had about [Mary] with her dad and so I told Dr. Edralin what I knew about what had happened with my sister and the cameras and Dr. Edralin said he thought the timing was really weird because [Hogan] had just come in there and talked to him about buying bras for [Mary]. And he felt like that was odd, and he expressed that to us.

Zoanni testified that Mary's puberty exam was on February 3, 2014. The following day, Zoanni created a "Fight for [Mary]" blog. And the day after, Zoanni sent a letter to "Dr. Edralin letting him know how [she] felt and asking—basically, taking [Mary] out of his care."

On February 5, 2014, Zoanni also wrote a letter to Pastor Tim Barker, an official in the Assemblies of God administration, stating:

> Hogan still has severe issues... Please tell me if you think it[']s right that a minister who is involved in child porn is put back into a church as children's pastor after one year visiting another pastor once a month and an online course as his rehab??
>
> . . .
>
> Hogan still has severe issues... There is an open Sex Crimes case with Harris County Precinct 4, Case Number 13-98077....I filed a report on him last summer.

When asked about her letter to Pastor Barker, Zoanni testified she attempted to clarify the statement about "child porn:"

> In my first—or in that e-mail February 5th, I believe it was, I had made a comment about, "How do you feel that it's right that a person or a minister with—that's involved in child porn be placed back into the ministry?"
>
> And after learning that I had not used that term correctly—again, I'm thinking he's physically there watching a child for his own sexual gratification, and in my mind, that's what that was.
>
> So I used that term in that e-mail and when I learned that that was not the term, I sent the e-mail back to those exact people and I said, "I made a mistake. I used this term and that's not what this meant and this is exactly what I thought it meant. I was wrong. I apologize. I'll tell whoever you want me to tell that I made a mistake."

On redirect, Zoanni testified about the incident at the church retreat involving the Tulloses. She testified she saw Hogan with his hands inside a fake plant on top of an armoire in the Tulloses' bedroom, and she saw a small camera in Hogan's hand when he turned around to face her. Zoanni also testified about a February 13, 2013 letter she sent to Jim Bradford, the General Secretary of the Assemblies of God, where she discussed the Tullos incident at the church retreat, catching Hogan watching the Girls Gone Wild infomercial at their home, Hogan's alleged confessions about the attic incident involving Sarah, and Hogan watching women in a dressing room at a costume store. Zoanni admitted that the comments in her letter were similar to those she posted on Facebook.

17

On February 12, 2014, Zoanni also emailed Mary's third grade homeroom teacher and the school counselor. Zoanni stated in her email:

> [Mary] is going back to her dad today and there are some major changes at her dad[']s church very soon. He is possibly being removed from his position along with his parents due to his continuing perversions. She really wants to talk to you today.

> Here is my blog if you want to follow our story.

> www.fightfor[mary].typepad.com

On April 3, 2014, Zoanni responded to a friend's post on Facebook. In her response, Zoanni stated:

> Thank you! My ex husband is suing me for defamation (which it is not) and trying to take custody of [Mary] and wanting me to pay child support. He's also soon to lose his Assemblies of God credentials. My lawyers told me not to blog or Facebook about him until the lawsuit is done. I'm sure everyone is wondering where I've gone! For custody purposes the "defamation" lawsuit may hurt me ... we are not sure. But my ex and his family are fighting like the evil people we know them to be. I say bring it on!

Zoanni later posted on Facebook that she had started blogging again. Zoanni began blogging on February 3, 2014, and she admitted she published a blog post daily from February 3 to February 22, from February 24 to March 3, and another post on March 7, 2014. Zoanni's blog was admitted into evidence in its entirety.

On recross-examination, Zoanni was asked about Marty Burroughs' deposition testimony:[9]

Q    Did [he] testify under oath, subject to cross-examination, that [Hogan] confessed to [him] his intent of putting a camera to spy on Kim and Pockets [Tullos] having sex?

A.    Yes, sir.

Q.    And did Mr. Burroughs discuss [Hogan] having a problem with masturbation since approximately the age of 10?

A.    Yes, sir.

Q.    And with respect to this incident of crawling up in the attic and spying down through the exhaust fan, [Hogan] was hoping to see who, according to his admission and his confessions?

A.    He said he thought he was going to see [the other girl].

Zoanni acknowledged that some of her statements had the potential to injure someone's reputation. She also agreed that the statement in her blog referring to Hogan as a "confessed voyeur pedophile" could "potentially" injure Hogan's occupation and reputation. When asked about the claim she made in her letter to Pastor Barker, Zoanni testified that a pastor's reputation and occupation could "potentially" be injured if someone thought the pastor had a sex crimes case pending against him. Zoanni also testified she made her allegations against Hogan because she wanted him to be removed from his position as youth pastor at the Church.

---

[9]    Marty Burrough is an ordained pastor in the Assemblies of God Church.

Zoanni testified, "I don't think that anyone that has that kind of sexual interest in young people should be regularly exposed to them or employed by coming in contact with them every day."

**D.    Amy Hogan**

Hogan's current wife, Amy Hogan, testified next. She discussed the mental anguish Hogan had suffered and the damage to his reputation resulting from Zoanni's statements. Amy testified she learned about Zoanni's blog from mutual friends at the Church. When asked whether Hogan had suffered mental anguish, Amy testified:

> Trying to attend school events is always a challenge because we never know of what parents are aware of, what's been said, or what's been read or told. I know attending [Mary's] old school, no one spoke to him whatsoever, completely ignored him, wouldn't—I mean, even—it was like very apparent that they all knew what was going on and he was treated—I mean, completely ignored.

According to Amy, Mary's teachers and other parents would interact with Zoanni, but not Hogan and Amy, and at Mary's prior school, Amy sat alone at a table because no one wanted to sit with her. Amy also testified that her friends no longer want to associate with Hogan. She testified:

> Being that—I mean, there's—the church was large, larger back before all of the blog and so many people have left. We generally can't go anywhere without being recognized and avoided and literally talked about and pointed at through our entire meal. It's pretty embarrassing.

Amy testified that when they wave or say hello to people they have known for years, "They just look back down at their food and act like they didn't see us. If [Mary] is with us, sometimes they'll acknowledge [Mary]." When asked "what, through your own eyes, psychologically, you've seen that [Hogan] does in order to avoid anything that someone could use against him and say that he's a pedophile, a child molester, or a peeping Tom," Amy testified that Hogan leaves the bathroom when Amy showers or undresses and he gets out of bed if Amy's young daughter climbs into bed with them.

Amy testified that following Zoanni's blog, the South Texas District of the Assemblies of God disallowed Hogan from attending events that involve children and he was "devastated." Amy testified that after Zoanni started blogging, people left the Church and staff quit. When asked if "people believe[d] everything that [Zoanni] already admitted she lied about," Amy answered, "Yes." She testified:

> Q.  How have you seen [Hogan] react to the people that say horrible, awful things that should be done to [Hogan]?
>
> A.  It's hard to even believe that people would say these things, just under the assumption that her blog was accurate. It's an awful, awful feeling to know that people are saying that, you know, he's—let the inmates deal with him, and [Rick Zoanni] and whoever the friend was needs to go get friends and find him in a dark alley and it's just—it's very upsetting.

Amy testified that she and other people at the Church got concealed handgun permits "[b]ecause we were concerned for our own safety. Of the people, of the

21

church, and of our own families, our daughters." According to Amy, people that Hogan has known for decades, his high school friends and youth group members he used to mentor, now ignore him. When asked what she thought Hogan's "reputation is in the community right now after Ms. Zoanni's blog was posted," Amy testified, "Ten being the best? A one."

On cross–examination, Amy testified that the South Texas District of the Assemblies of God investigated Zoanni's allegations and afterwards, the District put some restrictions on Hogan. When asked if she had "ever read [Marty Burroughs'] five-page statement, Defendant's Exhibit 7, with regard to what David discussed with him," she answered, "No." She testified she had seen portions of Burroughs' and Justin Trapp's[10] depositions:

> Q. And the portions that you watched, did they include the part where Mr. Burroughs and Mr. [Trapp] confirmed that [Hogan] confessed to them that camera in Corpus Christi on Kim and Pockets Tullos and [Hogan] confessed to them that he went up into the attic, he noticed he could remove the fan and look down, and he went up into the attic to see [the other 14-year-old girl] get undressed and take a shower?
>
> A. No.

---

[10] Justin Trapp was the Assistant Youth Pastor at Spring First Church in May 2005, when Hogan was the Youth Pastor.

22

On redirect, Amy testified that Rev. Joseph Granberry, who had been the Superintendent of the South Texas District of the Assemblies of God in 2005, is her grandfather, and she spoke to him about Hogan.

**E.    Robert Martin**

Robert Martin testified that he was on the Church's board when the Church decided to reinstate Hogan and hire him back as Youth Pastor. Martin understood that Hogan had left his position because of pornography and "it was not child pornography." He discussed what he perceived to be the damage to Hogan's reputation resulting from Zoanni's allegations:

> Q.    How would you say, on a scale of one to ten, before any accusation that Ms. Zoanni had made about David Hogan, would there be any reason you'd say anything less than ten?
>
> A.    Not at all.
>
> Q.    What about when those first letters she started throwing to the Assemblies of God, accusing him of being a pedophile? Did that hurt his reputation?
>
> A.    It did.
>
> Q.    Hurt his occupation?
>
> A.    It did.
>
> Q.    What about when that blog started?
>
> A.    It was terrifying. It rippled through the whole church. It affected every ministry in the church. People began to leave. Families began to separate. My own son and his daughter took their kids out of youth and left the church because they didn't want to wait to determine if there was—if there was truth in the blog. They

23

didn't want to take the chance that their children would be hurt. So they left.

According to Martin, people did not want to work with Hogan because of Zoanni's accusations and several employees quit:

> Q.   Mr. Martin, on a scale of one to ten, how do you believe that [Hogan's] reputation is in the community, based on the accusations of child pornography, pedophilia, and even sexually assaulting his own daughter, have been on his reputation?
>
> A.   Right now his reputation is one. Low. It's zero.

According to Martin, Hogan "can't go anywhere without running into someone that knows about it, has read the blog, has heard about it from the church. So his reputation has been pretty much shot."

On cross-examination, Martin testified that Burroughs was the South Texas District's Youth Director in 2005, and he agreed that "for a period of time when [Hogan] was youth director, he reported, obviously, to his mother and father, Sr. Pastor Hogan and Brenda Hogan." When asked if Hogan reported to Burroughs, Martin testified, "He didn't really report to him, but [Burroughs] kind of directed all the youth activities at the district level." Martin testified that he read the statements Burroughs and Trapp gave to the Church, but he did not believe they were accurate.

## F.   David Hogan

Hogan testified about Zoanni's statements and the impact her allegations had on his emotional well-being and reputation. When asked about the attic incident,

24

Hogan testified that when he went up into the attic to retrieve a suitcase, he looked over at the vent for five seconds:

> When I looked over, you could see that the light was on. You could see light coming through between the—between the sheetrock, I guess, and the vent fan. There's very small amount of daylight, and you could see that there was somebody in there. I could see the top of somebody's head but could not make out who that was.
>
> . . .
>
> Q. You didn't stay there and spy and watch her like the voyeur that they've said you have been?
>
> A. No, sir.
>
> Q. You didn't go up there to masturbate on the staircase?
>
> A. No.

Hogan testified:

> The first time that I heard that I was up there masturbating was that, I believe in one of the police reports that got turned over to CPS stating that [Zoanni] stated in that report to the CPS agent that I was—that I had confessed to her that I was masturbating to the video footage, which is ridiculous because there was never a video camera up there ever and I had never confessed anything like that to her. It was a completely bogus story.

With respect to the camera Zoanni claimed Hogan attempted to place in the Tulloses' bedroom, Hogan testified the camera "does not record at all." It requires a "secondary monitor to be able to produce a picture." Hogan never got the camera to work.

When asked about the incident at the costume store, Hogan testified the store had two changing rooms that were "kind of covered by—it's not like a door you go in and close; it's curtains that you have to pull closed." He testified:

> As I walked by, [the woman] had left maybe a 6-inch gap in that curtain but the mirror there, you could see her and I immediately went over to the friend and said, "Hey, you should probably close the curtain. I think you can see in it a little bit," and she's like, "Oh, my goodness, thank you," and she closed the curtain and that was the end of it.

According to Hogan, the incident lasted no more than ten seconds. "When I noticed it, I immediately went over and told the woman."

On cross-examination, Hogan testified he started watching pornography in college and he continued to do so while married to Zoanni. He also admitted describing himself to Ron Turner in June 2005 "as habitual with regard to pornography." He admitted that during the first year and a half of his marriage to Zoanni, he would watch pornography on the Church's computers. When asked about the incident at the church retreat involving the Tulloses, Hogan testified he "would have never set up the camera with the intention to record them having sex. It would have been physically impossible to record them." He explained that as he

> . . . began to talk to the higher-ups in the Assemblies of God, [Zoanni] was with me and she wanted this story to be on the record as well and I think I ended up confessing this whole story to about nine different people through the process of the Assemblies of God with regard to having ministerial credentials or being ordained. At no time did anybody feel like it was necessary to inform Kim and Pockets Tullos. Specifically, Reverend Joe [Granberry] and Marty Burroughs didn't feel like it was needed since nothing ever happened; and I'd only agreed

26

to that at some point when I had the camera, it had crossed my mind to use it for an improper purpose but have never acted on that or recorded anyone.

Q. What was the improper purpose that crossed your mind to use the camera for?

A. When [Zoanni] came into the room and asked me what I was doing, she said, "Were you thinking about setting up this camera so you could see Pockets and Kim," and I said, "Well, that was not my intention. That's not why I was playing with the camera in here, trying to get—to see if it worked but that did cross my mind but I would never do that," and, obviously, she was very upset and then to this day has just kind of beat the drum that that was my intention and that's the sole purpose of what I was doing with that camera.

Q. You said you talked to Marty Burroughs. Didn't you confess to Marty Burroughs that was your intent?

A. No, sir.

Q. Didn't you confess to Justin Trapp that was your intent?

A. No, sir.

Hogan admitted watching the Girls Gone Wild infomercial and seeing similar commercials before. As to the incident in the attic, he testified:

Q. [S]ee where it says "[Hogan] denied all charges of ever viewing a minor without clothes on. He did confess that years ago he did have temptations in this area but never acted on it, only tempted," correct? You see that?

A. Yes, I do see that.

27

Q. Is that an accurate report by Mr. [Don] Wiehe?[11]

A. I did deny all charges of ever viewing a minor without clothes on.

Q. Okay. Did you confess temptations in the area?

A. Yes, I told him this story about—about the attic that I had disclosed to them. He was referring to this story.

. . .

Q. So then tell the jury how that five-second, inadvertent, accidental glance instituted in your mind a temptation.

A. I don't think the temptation was at that point. The reason I disclosed it to [Zoanni] and to my parents and to Pastor Joe [Granberry], who's the district superintendent, was to make sure that I didn't ever have the temptation to ever go back up there at another point in time.

. . .

Q. Okay. And with Marty Burroughs, I believe you went to see Marty Burroughs—is it the next day? Let's back up. There's the viewing in the attic, whenever it is, there's the Girls Gone Wild episode, [Zoanni] says you discussed the attic with her that night, you say you discussed it the next morning with your mom and dad?

A. Correct.

Q. Do you talk to Marty Burroughs next day after talking to mom and dad or the following day?

A. Both.

---

[11] Don Wiehe was the Secretary Treasurer of the South Texas District Executive Presbytery in 2014.

28

> Q. Both. Good enough. And the subject came up, but you never discussed the details with Marty Burroughs; that's your testimony, correct?
>
> A. On which day?
>
> Q. Either day.

At that point, Hogan's counsel interjected:

> Judge, it's already been discussed and we already have our trial objection to any discussions with Marty Burroughs as a privilege with clergy. We've already written a brief on this. He's well aware of the fact that we're claiming that it's part of a privilege under clergy. It's stated in the deposition. So, ultimately, any of these questions that he's asking, he has to be able to have him waive it and he's never waived it and he's always asserted the clergy privilege.

The trial court did not rule on the objection. Rather, Zoanni's counsel stated he would "move to something else right now and come back to it."

> When asked about the police report Zoanni filed, Hogan testified:

> When I read that, I didn't know that she had gone to the police until right after she started blogging. I saw–I got ahold of the letter, I think, that she wrote to either [Pastor] Tim Barker or James Bradford talking about there was an open sex crimes case.

> Hogan also testified about the impact Zoanni's allegations had on him.

According to Hogan:

> [Zoanni] released that Facebook post on the 29th of December in 2013. I think that was the first thing that went public. And it was—it was immediate. And then when she started the blog, I mean, within—within just a couple of weeks, I mean, the [Church's] attendance numbers were just devastating. It was hard to even walk—me and my mom and dad, you know, sit on the front row because, you know, all of our pastoral staff stands on the front row. We would walk in, and we were looking

29

around to see who we weren't going to see in the congregation the next week.

After the blog, people also began acting differently towards Hogan:

> I was at dinner last night at a restaurant in The Woodlands and we were at Longhorn Steakhouse and some people walked in from our church named Ralph and Peggy Allen. I've known them since I was 5 years old and grew up with their son, and they had gone to our church forever until [Zoanni] started blogging and he even began to comment on the blog that he believed every word. It caused a problem in their family because Peggy Allen, she was kind of on the fence and wanted to still be coming; and, eventually, they're not involved at all.

> They walked in, walked right past us, saw us, wouldn't even look at us after that. It's still ongoing. It's not changed one bit.

Hogan described these encounters as "awful" and a "regular occurrence."

Hogan testified that "especially when the blog was continuing to go on, I was afraid to walk anywhere in public and afraid that you'd see somebody you know, just to see how they're going to respond to you." Hogan also expressed concern that Zoanni's blog and Facebook page were online at the time of trial. According to Hogan, he spent many sleepless nights after Zoanni began blogging. When asked if there were any days when he did not want to get out of bed in the morning, Hogan testified:

> Absolutely. Every day. Just didn't want to have to see anybody, didn't want to have people questioning about it, didn't want to go to work. You know, the weeks I have [Mary], I mean, just did the best I could to not try to let her see those emotions outwardly; but inside, just gut-wrenching.

30

Hogan testified that while Zoanni was actively blogging in February and March 2014, "the anticipation, I guess, of wondering what's she going to say today, what new thing is going to be in there that's inaccurate, and the anxiety that comes along with that is overwhelming."  According to Hogan:

Because every time something new gets added to it, people start calling the church, people start texting my mom and dad; and every day it's just the sense of panic that goes over you like, what are you going to do?  There's no—it's [a] very hopeless and helpless feeling that is physically overwhelming.

When asked if he felt physically sick because of the allegations Zoanni made in her blog, Hogan testified:

Absolutely.  Trying to think of a way to describe the anxiety when—maybe the sick feeling that like if you get—when you get pulled over, if you're speeding or something like that, if you've ever had that feeling if your heart is racing of, you know, what's going to happen, where you just have this like gut-wrenching feeling of—I don't know how to explain it but it physically makes you feel ill and it doesn't go away.  It's not like it subsided.  I went to bed feeling that way, wake up in the middle of the night and you're—I remember so many nights waking up in the middle of the night and thinking, Please tell me this is just a bad dream, and then realizing this is my reality every single day.

According to Hogan, the "statements [Zoanni] made in [her] blog have systematically ruined my life, privately and professionally."  When asked if "anyone has complete trust having you as a pastor or even when they see you out in public anymore," Hogan testified, "No.  You can't unring that bell.  There will always be the wonder."  Hogan testified that before Zoanni began blogging, he was very proud of his name, but afterwards, he worries how people will react when he tells people

31

his name is "David Hogan." He also testified that he attended a political event a few weeks before trial and "the people that were checking me in used to go to our church and jokingly, thinking, I guess, that it's funny at this point, refer to me as Chester."[12] When asked how he felt when it happened, Hogan testified:

> Well, it's awful. Because then you're thinking, you know, these people have like read all of this stuff that's untrue. And then another part of my life that I really enjoy and feel a duty to be involved in, you know, with my, I guess, political beliefs and want to be able to be involved with my community in that way and then thinking are these people then sharing that information with everybody else in Senate District 7?

According to Hogan, "Being called a pedophile, whether you are or aren't, is incredibly damaging to your reputation; and I can tell you that firsthand."

Hogan testified that he and Amy got permits to carry concealed handguns for "her personal safety, first of all, but since this, although this stuff came out on this blog, I have regularly feared for my own safety." He testified people left dead animal parts on his front porch for about two months and that people tried breaking into his home. Hogan testified that Mary found the blog when she was at school and, in addition to worry about what the information in the blog would do to Mary, he was worried about the blog being available online because others could use it to make fun of Mary or bully her.

---

[12] Zoanni referred to Hogan as "Chester" in her blog. On re-direct examination, Zoanni testified, "I was listening to your question and the definition of Chester. I don't know what it means but I've heard the connotation of Chester the Molester before, but I was not using that to say that [Hogan] is a molester."

When asked about the letter Zoanni wrote to Dr. Edralin, Hogan testified that Dr. Edralin's staff also read the letter. When asked if he could "name anybody out there that thinks less of you because of" the letter, Hogan testified, "I know some of the names of the other doctors up there that read it, so yes."

Hogan was also asked during cross-examination about Zoanni's February 2014 email to Pastor Barker. Hogan agreed that "the only people that read [the email] were in the Assemblies of God hierarchy." When asked to "[n]ame one person in the Assemblies of God hierarchy who thinks less of you today because of that February 5, 2014, letter," Hogan identified James Bradford, George Wood, Charles Crabtree, and "[t]he entire executive presbytery of the general counsel." "That would be about 75 people."

Hogan was also asked about Zoanni's Facebook post in which she stated, "Growing concerns for my baby girl! . . . What a good dad DOES NOT do: He doesn't film young girls in his youth group going to the bathroom and getting into the shower thru the bathroom air vent in his house (caught and admitted to) . . ." When asked how many people had seen the post during the seventeen to twenty-four hours before Zoanni revised it,[13] Hogan testified, "it was a public post, and it was being shared and liked and commented on. There's no way for any of us to cap that number on how many people." When asked if he could identify any of those people

---

[13]     Zoanni replaced the word "film" with "spy" in the post.

33

by name, Hogan responded, "I've got names." When asked if he could "name one person who thinks less of you because of the word 'filmed' in that post," Hogan testified, "My answer would be all of them."

## G.    Detective Russell Ackley

Detective Ackley works with the Harris County Sheriff's Office, Special Victims Unit, FBI Child Exploitation Task Force. Deputy Nelson's police report was forwarded to Detective Ackley, who reviewed the report. Detective Ackley stated in his report:

> After reviewing this case, I, Deputy R. Ackley . . . contacted CPS Intake. In regards to the CPS report, I was told that the case had been closed at Intake, due to the child not making any disclosure.
>
> Further, after reading the report, there is no physical evidence, due to the wife not seeing any child pornography, to support any type of further action.
>
> No further Information. Case closed.

In a supplemental report, Detective Ackley stated:

> On Tuesday, September 2, 2014, I went and was deposed in this case for civil/family matters. During the deposition, notice was made that [Zoanni] wanted to recant or clarify the allegations that were made when the original report was made.
>
> On Wednesday, September 3, 2014, I received an email, as well as a voice message, that [Zoanni] wanted to have the report clarified. . .

A portion of Detective Ackley's deposition was also played for the jury.

## H. Justin Trapp

Justin Trapp was the Assistant Youth Pastor at the Church in May 2005, when Hogan was the Youth Pastor. Trapp, who grew up in the Church, has known Hogan since Trapp was 11 years old. When asked about Hogan's reputation for the truth, Trapp testified, "I would say maybe gray area. . . Bendable or relative, I guess."

Trapp was interviewed by the Assemblies of God during an investigation of Hogan. He testified that Marty Burroughs did not interview him, but he spoke to him about these incidents.

Trapp prepared a two-page statement requested by the Church. In his statement to the Church, admitted as Defendant's Exhibit 3, Trapp stated he took his girlfriend to the theatre one evening in May 2005. When he turned his cell phone back on hours later, he had several voicemails informing him that Hogan, who "had a last minute emergency," had been unable to attend the Church's weekly youth service that evening. Trapp was confused by this development and called Zoanni during his drive home. According to Trapp, Zoanni was upset, and she asked Trapp if he knew that Hogan "had a problem with pornography." Trapp told Zoanni that he had "wondered after finding porn on his computer one day but quickly dismissed [the thought] thinking it must have been the janitor." Zoanni told Trapp about the incident involving the Tulloses and Hogan's purported confession about spying "on

[Zoanni's] sister Sara[h] while she was going to the bathroom from the attic." Zoanni told Trapp that "[Hogan] had struggled with porn from time to time."

Trapp testified that within a few days, Hogan came to see him at his office. Trapp told Hogan he "found porn on his computer and [Hogan] admitted he thought I knew he had a problem all along." With respect to the incident involving the Tulloses, Hogan "said he didn't know what he was thinking and had no excuse." And as to the attic incident, Trapp testified Hogan told him he "figured out that he could look through the vent in the bathroom" and "only looked at Sarah while she went to the bathroom" and he "knew it was wrong." Hogan told Trapp "he needed help and that he thought [Trapp] would be best to replace him as youth pastor."

On cross-examination, Trapp testified he had read Zoanni's Facebook posts and blog and he knew other people who had read the blog as well. He admitted that when Zoanni worked at the Church, there were "some work issues where she hadn't been honest with [him]." Trapp, who replaced Hogan as Youth Pastor when Hogan stepped down in 2005, became involved in the Church's investigation of Hogan when Zoanni asked him to write an official letter to the "National Assemblies" of "what [Hogan] told" him." According to Trapp, he, Zoanni, and her family met with the State Assemblies of God.

Trapp was asked about the impact some of the allegations Zoanni made against Hogan would have on someone. Trapp testified that if someone accused him

36

of being involved in or in possession of child pornography, it would damage Trapp's reputation, make it difficult for him to continue to be a minister, and cause him anxiety and mental anguish. When asked how it would affect him if everyone at his child's daycare knew about the allegation that he was involved in child pornography, Trapp testified that it would change his interactions with the people at the daycare and cause him anxiety. Trapp agreed that it would also damage his reputation and cause him mental anguish if someone accused him of molesting his child or being a pedophile.

## I.    Sarah Basset

Sarah is Zoanni's younger sister. Sarah testified that she and Zoanni went to the Harris County Police Department to file a statement in 2013. She testified she "was aware at this point that [Hogan] had issues with voyeurism, me being one of the victims as a minor," and they "wanted to file a statement, just to have it on record of what he did to me when I was a minor at 14 years old." She stated:

> We told the officer of the knowledge that [Zoanni] had of what [Hogan] had done to me as a minor; and after that was over, the officer had asked [Zoanni] has [Mary]—because we mentioned [Mary] getting older—has [Mary] ever said anything about [Hogan] doing anything to her, and we both said no.
>
> . . .
>
> So I interrupted [Deputy Nelson]; and I said, "Look, all we're saying in regards to that, from [Hogan] having an issue with minors, is that if you had a search warrant and he didn't know you were coming into his

37

house and you came in, I would not be surprised if you found child pornography."

Sarah denied that Zoanni accused Hogan of having child pornography during that meeting and she testified that the "only time the words came out of anyone's mouth was my own, and I didn't even accuse him. I said I wouldn't be surprised."

When asked what she knew about Hogan in 2005, Sarah testified:

Q.   And what you heard back then was that he had watched pornography, right?

A.   Yes.

Q.   You knew that he had resigned his position, stepped down from his position for a year, right?

A.   Yes.

Q.   And that during that time you and—your sister and he had both gone off to counseling in Ohio and then came back here and met with a counselor for about a year after that, right?

A.   Yes.

According to Sarah, "the State board actually reinstated [Hogan] and put him back in [the Church] and gave his credentials back in full standing."

## J.   Linda Montagne

Linda Montagne, Zoanni's and Sarah's mother, testified about Zoanni's conversation with her concerning Hogan's alleged confession involving the Girls Gone Wild infomercial and Sarah. Zoanni told her that when she tried to get her suitcase from the garage after discovering Hogan watching the Girls Gone Wild

infomercial, Hogan "stood in front of her and the way she described it is he had his arms way up in the air and his legs spread like an X and he wouldn't let her through the door." According to Linda, Hogan told Zoanni he had "things I need to tell you" and "he started to confess things to [Zoanni]" involving the attic incident with Sarah.

Linda also discussed the events with Dr. Edralin. According to Linda, Dr. Edralin told her and Zoanni that he was concerned for Mary because Hogan had scheduled a "puberty check appointment" for Mary and he had been asking Dr. Edralin questions about "bra shopping" for Mary. Dr. Edralin told Linda and Zoanni that he thought it was "very unnatural for a father to have such interest in his young daughter's physical development in that way." According to Linda, Dr. Edralin gave Zoanni the phone number of his attorney and told Zoanni that she needed to get custody of Mary.

## K.    Kevin Montagne

Kevin Montagne, Zoanni's and Sarah's father, testified that after Linda and Zoanni told him about Hogan's misdeeds and confession, he spoke to Hogan privately:

> It was just the two of us in the room; and as we sat there, he was very broken. There was a lot of tears between the two of us. Very remorseful. And he said that he had looked down the vent in the bathroom to see and saw my daughter, my young daughter, Sarah, who was 14 at the time.

When asked if it was his understanding that Hogan had "intentionally planned his peeping activity," Kevin testified, "There was no doubt in my mind that it was planned when he told me that he thought it was going to be [another] person, the other girl."

**The Jury's Verdict**

The case proceeded to trial on Hogan's defamation claim based on thirteen alleged defamatory statements. The jury found that all thirteen statements were false when made by Zoanni. The jury found that six of the statements were defamatory, and for the rest, it found that Zoanni knew or should have known, in the exercise of ordinary care, that the statements were false and had the potential to be defamatory.

The jury awarded Hogan compensatory damages for past and future damage to his reputation and past and future mental anguish. Because the jury unanimously found that Zoanni had acted with malice, the trial court held a separate trial on the issue of punitive damages. After hearing testimony from Hogan's mother, Brenda, and Zoanni, the jury awarded Hogan $0 in punitive damages. The trial court rendered judgment pursuant to the jury verdict and awarded Hogan a total of $2,100,000 in actual damages consisting of (1) $1,450,000 for past and future damage to his reputation, and (2) $600,000 for past and future mental anguish. Zoanni filed a motion for new trial, which the trial court denied.

This appeal followed.

40

## The Defamation Mitigation Act

In her first issue, Zoanni argues that because Hogan failed to comply with the Defamation Mitigation Act ("DMA") with respect to nine of the thirteen alleged defamatory statements, the judgment should be reversed and rendered in her favor as to those nine statements. In *Zoanni I*, a different panel of this Court sustained Zoanni's first issue. *See Zoanni v. Hogan*, 555 S.W.3d 321, 331 (Tex. App.—Houston [1st Dist.] 2018), *rev'd and remanded*, *Hogan v. Zoanni*, 627 S.W.3d 163 (Tex. 2021).[14] This Court concluded that under the DMA, a request for correction is a necessary predicate to submit each alleged instance of defamation to the jury and that because Hogan had not issued a correction request for nine of the thirteen statements and the deadline to comply had expired, dismissal of the defamation claim as to the nine statements was required. *Zoanni I*, 555 S.W.3d at 327. The Texas Supreme Court reversed this Court's opinion holding that if a "plaintiff fails to provide the necessary request [under the DMA] and a defendant timely files a plea in abatement, the suit must abate until the plaintiff responds with a written request." *Hogan*, 627 S.W.3d at 176. The Supreme Court held that the "plain language of the [DMA] does not support a right to dismissal for failing to provide a sufficient request before the statute of limitations expires." *Id.* at 176–77. The Supreme Court

---

[14] The panel consisted of Justices Jennings, Massengale, and Caughey. Justice Jennings dissented to Justice Caughey's majority opinion.

reversed and remanded for this Court to consider Zoanni's remaining issues on appeal.

In her four remaining issues on remand, Zoanni argues that (1) with respect to damages, the trial court erroneously failed to submit an instruction on mitigation of damages, there is legally or factually insufficient evidence to support the award of damages, the damage award is "manifestly too large," and the award impermissibly includes punitive damages, (2) part of the judgment improperly penalizes Zoanni for her opinions, (3) there is legally insufficient evidence that Zoanni published certain police report statements, and (4) the trial court erroneously excluded testimony based on the clergy privilege.

## Clergy Privilege

Zoanni argues in her fourth issue on remand that "the trial court erroneously excluded the testimony of Rev. Marty Burroughs and his statement to the Church based on the clergy privilege." We hold that even if the trial court erred in excluding Burroughs' testimony, the error was harmless.

## A. Standard of Review and Applicable Law

Texas Rule of Evidence 505, "Privilege For Communications to a Clergy Member," states:

(a) Definitions. In this rule:

(1) A "clergy member" is a minister, priest, rabbi, accredited Christian Science Practitioner, or other similar functionary

42

of a religious organization or someone whom a communicant reasonably believes is a clergy member.

(2) A "communicant" is a person who consults a clergy member in the clergy member's professional capacity as a spiritual adviser.

(3) A communication is "confidential" if made privately and not intended for further disclosure except to other persons present to further the purpose of the communication.

(b) General Rule. A communicant has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication by the communicant to a clergy member in the clergy member's professional capacity as spiritual adviser.

(c) Who May Claim. The privilege may be claimed by:

(1) the communicant;

(2) the communicant's guardian or conservator; or

(3) a deceased communicant's personal representative.

The clergy member to whom the communication was made may claim the privilege on the communicant's behalf—and is presumed to have authority to do so.

TEX. R. EVID. 505.

## B. Offer of Proof: Rev. Marty Burroughs

Zoanni made two offers of proof during the trial. One of them involved testimony from Rev. Marty Burroughs, a Pastor with the Assemblies of God Church. Burroughs testified that he has known Hogan since Hogan was 12 years old.

43

Burroughs served as Hogan's Youth Pastor when Hogan was a teen. Burroughs considered Hogan his protégé.

In 2005, Burroughs was working in the Church's district office as the District Youth Director when Hogan called and asked to meet with him. Burroughs testified that after he spoke with Hogan, Burroughs informed Hogan that their discussion was "private but not secret." Burroughs also told Hogan that Hogan "would have to tell the board of the church and [Hogan] would have to tell the district . . . officials because . . . I wasn't the official to be told." Burroughs also testified that he did not report his conversation with Hogan up the chain in the Assemblies of God initially because he "made sure that [Hogan] did." According to Burroughs, Hogan made a confession to Rev. Joseph Granberry, the District Superintendent. Burroughs testified that he "followed up to make sure that [Hogan] told the whole story because he doesn't ever tell the whole story."

The trial judge questioned Burroughs about the nature of his conversation with Hogan:

Q. Mr. Burroughs, your discussion with [Hogan], what was the discussion about?

A. First it was about the pornography and I just kept feeling like there was more and he kept, I guess, saying more.

Q. He kept saying more or you were asking him?

A. I was asking and he was telling me, you know. Just kept feeling like there was more, and so he said that—

Q.   So what did he confess to you without prompting?

A.   That he got—that [Zoanni] walked in on him watching and rewatching the Girls Gone Wild commercial and she flipped out and went screaming to the bathroom and, you know, at this point I'm thinking this is a really minor thing and then—I don't know if I said it or what happened next or, you know, she came out of the bathroom, ran towards the garage and he stopped her there and said, "No, I'll tell you. I'll tell you." And so I guess he told her then that he had, I guess, gone up into the attic and looked into the bathroom and I—

Q.   And you don't remember if this story. . . came out because you prompted him or he was completing the story after the Girls Gone Wild?

A.   I would say it would be because I was asking him, you know, what else because it seemed like such a major case for something—not so major. And it kept being more.

**1.   Burroughs' Statement to the Assemblies of God**

Burroughs provided a statement to the District Office for the Church, which was not admitted at trial. When asked about this statement during the offer of proof, Burroughs explained that "this statement here was requested of me by the district office" when they began "reinvestigating" Hogan in 2014. In his statement to the church, Burroughs reported:

> [Hogan] told me that his wife, [Zoanni], had walked up behind him in the living room and had caught him watching and re-watching a "Girls gone wild" commercial. It was not porn but just barely not porn. He said that he was playing it, pausing it, and replaying it over and over.
>
> . . .
>
> He said that he told her that he had a problem with porn for a really long time and it would get better then worse.

45

. . .

He then began to tell me the story of how he had taken a little security system camera that he and I had bought while on a missions trip to Hong Kong and he had attempted to use it to video/spy on Pockets and Kim Tullos. This was done at the Port Royal Condos on Mustang Island during a Speed the Light Bike-A-Thon. [Hogan] & [Zoanni] were sharing a 2 bedroom condo with his college roommate Pockets and his wife Kim. [Hogan] said that he and [Zoanni] had gotten there early and she had gotten in the bathtub to help with her morning sickness. It was while [Zoanni] was in the bathtub that [Hogan] said he was trying to setup the camera in the bedroom of Pockets and Kim. He said that [Zoanni] walked in on him and caught him setting up the camera. He said that he told her that he was doing it as a prank, but she didn't believe him and I didn't either at this point.

I asked "is there anything else?" "Yes" he replied and then he told me that one time, when he was putting some stuff in his attic, he realized that he could see into the guest bathroom through the air vent or exhaust fan, I don't remember which. He said that one time when some of the girls from his youth group were there he climbed up into the attic, which was only accessible from the garage, with the intention of looking at them as they used the bathroom. He said that he intended to see [a female youth group member] but instead the girl in the restroom was Sarah Montagne. Sarah was [Hogan's] sister in law, [Zoanni's] younger sister, and at the time of this event she was 14 years old.

He said that he had never did that again but I at this point I did not believe that he was telling me the whole truth. It was also at this point that I realized that he would not be able to stay on the church staff in any position and that he needed a lot of help. My thoughts were simple that viewing porn is very wrong but attempting to video your friends in their private hotel bed and climbing up into the attic to spy on young girls using the restroom is a whole other level of messed up.

2.      **Burroughs' Deposition Testimony**

In his deposition, Burroughs testified that Hogan "came to me as his overseer in a spiritual way, not necessarily in—legally his overseer, and confessed." In

addition to the Girls Gone Wild incident and Hogan's problem with pornography, Hogan also confessed that "he had climbed up into the attic to see them in the bathroom, to see [a 14 year-old female youth group member] in the bathroom, . . . but it wasn't [her] that ended up going into the bathroom, . . . it was Sarah." Hogan told Burroughs that he had previously "put some luggage away [in the attic] and he noticed that he could see in the bathroom from the air vent." Hogan also told Burroughs that "he had taken a camera and had put it. . . I guess in the plastic plants in his friends' room, which it was a couple that was sharing that room." According to Burroughs, Hogan did not tell him that he intended to record the couple. Burroughs explained that while the camera was not able to record anything, the images captured by the camera could be projected onto a nearby screen.

On cross-examination, Burroughs testified that he worked in the Assemblies of God's District Office after he left the Church, and he is now the lead pastor at Northwood Assembly of God. Several of his current parishioners were formerly members of the Church. Burroughs testified that he was friends with Kevin, Zoanni's father, and when Burroughs worked in the district office, he had hired Kevin to work at several youth conventions and conferences.

## C.    Analysis

Assuming the trial court abused its discretion by erroneously excluding Burroughs' statements based on the clergy privilege, we can only reverse on this

basis if, after reviewing the entire record, we determine the trial court's error probably caused the rendition of an improper judgment. *See Gunn v. McCoy*, 554 S.W.3d 645, 668–69 (Tex. 2018); TEX. R. APP. P. 44.1(a)(1) (stating error is harmful if it "probably caused the rendition of an improper judgment").[15] In other words, the error "can be said to have contributed in a substantial way to bring about the adverse judgment." *Id.* (quotation omitted). Whether an error probably caused the rendition of an improper judgment "necessarily is a judgment call entrusted to the sound discretion and good senses of the reviewing court." *McCraw v. Maris*, 828 S.W.2d 756, 759 (Tex. 1992). The exclusion of evidence is likely harmless if it is cumulative of other testimony. *Gunn*, 554 S.W.3d at 668.

After reviewing the entire record, we conclude Burroughs' proffered testimony is largely cumulative of testimony provided by other witnesses, including Zoanni, her father Kevin, and Trapp. One of the critical portions of Burroughs' testimony is his assertion that Hogan confessed that he "climbed up into the attic [of his home]" with the "intention of looking at [the 14-year-old girls] as they used the bathroom." At trial, Hogan denied that he climbed up the attic with the intention of spying on anyone and he claimed he saw Sarah in the bathroom by accident.

---

[15] An error is also harmful if it "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a)(2). Zoanni, who made an offer of proof of Burroughs' testimony, does not argue that the exclusion of Burroughs' testimony from trial probably prevented her from properly presenting the case on appeal.

48

Like Burroughs, Trapp and Kevin testified that they understood from Hogan that he went into the attic with the intent to spy on a 14-year-old girl. Trapp, a Minister in the Assemblies of God, testified that Hogan confessed that "he figured out you could look into the bathroom into the AC vent and they had some girls from the youth group over, so [Hogan] climbed in the attic and looked down through the vent." When asked if he understood that Hogan had "intentionally planned his peeping activity," Kevin testified, "There was no doubt in my mind that it was planned when he told me that he thought it was going to be the other person, the other girl." Zoanni, Kevin, and Trapp also provided similar testimony regarding the other events Hogan described to Burroughs, such as trying to place a camera in the Tulloses' bedroom, watching a woman in a costume store dressing room, and Zoanni catching him watching the Girls Gone Wild infomercial.

Zoanni argues that Burroughs' testimony is not cumulative because Burroughs "was the central, unimpeachable, star witness on the biggest issue in this case" and Burroughs would have provided Zoanni's "best evidence" that she was telling the truth. While "testimony from a disinterested witness may lend substantial weight to similar testimony from an interested witness, particularly on a hotly-contested issue," the record reflects that Burroughs was not a disinterested witness, and Hogan's counsel would have been able to elicit testimony potentially

undermining Burroughs' credibility. *Hooper v. Chittaluru*, 222 S.W.3d 103, 110 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

During his deposition, Burroughs admitted that he had been friends with Zoanni's father, Kevin, for a long time and Burroughs had hired Kevin to work at several youth conferences. Burroughs' statement to the Church also suggests Burroughs harbors ill will towards Hogan and his parents, Robert and Brenda. While the first half of Burroughs' statement to the Church discusses Hogan's confession, the second half of the statement appears primarily concerned with what Burroughs characterizes as Robert's and Brenda's efforts to minimize the scope of Hogan's sexual transgressions and cover up the details of his confessions. Burroughs concluded by stating:

> This is just a summary of knowing and working with the Hogan family since 1990. I take no joy in saying it or even thinking about it but they are corrupt people who do not act as a minister should. I know story after story after story of things that they did, of lies, half-truth, manipulation, and cover-ups. It is my opinion that Robert, Brenda, and [Hogan] should NOT be allowed to continue as credentialed ministers of the Assemblies of God.

Burroughs' statement reflects that contrary to Zoanni's assertion, Burroughs is not an "unimpeachable" disinterested witness. Rather, the record reflects that like Zoanni, Burroughs made his statement to the Church in part because he wanted Hogan to lose his credentialing with the Assemblies of God. Burroughs also took this opportunity to air his grievances with Robert and Brenda and to argue that, like

50

their son, they too were unfit to lead the Church and they should also lose their credentialing with the Assemblies of God.

Because Burroughs' proffered testimony is largely cumulative of other admitted testimony, all of which involve confessions Hogan purportedly made to them in May 2005, and his statement reflects he is not an unimpeachable or disinterested witness, as Zoanni argues, we cannot say the trial court's exclusion of Burroughs' testimony and his statement to the Church probably caused the rendition of an improper judgment. *See Gunn*, 554 S.W.3d at 668–69; *see also* TEX. R. APP. P. 44.1(a)(1) (stating trial court error is reversible if it "probably caused the rendition of an improper judgment").

We overrule Zoanni's fourth issue.

**Defamatory Statements:  Opinions or Statements of Fact?**

In her second issue on remand, Zoanni argues that "part of the judgment improperly penalizes Zoanni for her opinions." *See Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2018) (stating actionable defamation requires among other things, publication of false statement of fact to third party).  According to Zoanni, the

following eleven statements are not actionable as defamation because they are purely subjective assertions or opinions:[16, 17]

1. "DATE: 7/18/2013...REPORTEE 1: MONTAGNE, STEPHANIE LYNN... SUSPECT 1: HOGAN, LEMUEL DAVID... Ms. Montagne feels strongly there is child pornography on David's computers."

2. "DATE: 7/18/2013...REPORTEE 1: MONTAGNE, STEPHANIE LYNN... SUSPECT 1: HOGAN, LEMUEL DAVID... She also feels that her daughter [Mary] is hiding some kind of sexual assault and will 'flip' when asked about it."

3. David Hogan...it was quite possible he was involved in child porn but we had no proof whatsoever that he is...Stephanie Montagne 281-703-5779

4. "David Hogan still has severe issues ... Please tell me if you think it[']s right that a minister who is involved in child porn is put back into a church as children's pastor after one year visiting another pastor once a month and an online course as his rehab??"

5. "David Hogan still has severe issues ... There is an open Sex Crimes case with Harris County Precinct 4, Case Number 13-98077.... I filed a report on him last summer."

6. "[Mary] will no longer be a patient of STEP Pediatrics ... her dad ... And please for the love of God, when you have been informed that a father is a pedophile ... DO NOT encourage him to sit in on a meeting where you are discussing breasts and pubic hair!"

7. "(In my Facebook blast I did several weeks ago I said he was caught and admitted to the camera in the bathroom. Let me be

---

[16] Zoanni concedes that the remaining two statements are statements of verifiable facts, not opinions. Both statements are defamatory per se and Zoanni does not challenge this finding on appeal.

[17] We numbered these statements for purposes of our analysis of Zoanni's third issue.

52

100% clear, he was guilty, but did not admit to the camera in the bathroom but I know it was there ...”

8. “How does a pedophile ... get any custody, much less 6 days at a time, of his daughter?”

9. “It was YOUR daughter (who just turned 9) who was drug to a doctor appointment scheduled ... to discuss her breast development and puberty! They sat YOUR baby girl on the exam table with complete embarrassment all over her little face, and the doctor grabbed her breasts and examined her lower regions with three men in the room including a confessed ... pedophile?”

10. “WHAT’S WRONG? YOU JUST HUMILIATED MY DAUGHTER AND ME IN FRONT OF HER ... PEDOPHILE FATHER AND HIS RIDICULOUS MOTHER!”

11. “This must have really upset both Chester and Belinda because from this point on overly sappy sweet Belinda was very cold to me. Yes your son has a problem with pre-teens and it’s sickening, so make him children’s pastor at Spring First Church!”[18]

## A.   Applicable Law

Defamation is defined generally “as the invasion of a person’s interest in [his] reputation and good name.” *Hancock v. Variyam*, 400 S.W.3d 59, 63 (Tex. 2013). Actionable defamation requires (1) publication of a false statement of fact to a third party, (2) that is defamatory concerning the plaintiff, (3) that is made with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual), and (4) that proximately causes damages. *See*

---

[18]   In her blog, Zoanni refers to Hogan’s mother, Brenda, as “Belinda.”

*Anderson*, 550 S.W.3d at 617–18 (citing *Bos v. Smith*, 556 S.W.3d 293, 307 (Tex. 2018)).

Defamatory statements are those that tend to (1) "injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury" or (2) "impeach any person's honesty, integrity, virtue, or reputation." TEX. CIV. PRAC. & REM. CODE § 73.001. "To qualify as defamation, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace." *MVS Int'l Corp. v. Int'l Advert. Sols., LLC*, 545 S.W.3d 180, 202 (Tex. App.—El Paso 2017, no pet.). A communication that considering the circumstances is "merely unflattering, abusive, annoying, irksome, or embarrassing" or "only hurts a person's feelings, is not actionable." *Id.*

To distinguish between an actionable statement of fact and a constitutionally protected expression of opinion, we focus on the statement's verifiability and the entire context in which it was made. *See Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002). To be actionable as defamation, a statement must be an assertion of verifiable fact, that is, a statement that purports to be verifiable. *See id.* at 583–84. A verifiably false statement, however, is not actionable as defamation if the entire context of the statement discloses that "it is merely an opinion masquerading as fact." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 639 (Tex. 2018). Whether a publication is an actionable statement of fact, or a protected expression

of opinion depends on a reasonable person's perception of the publication in its entirety. *Bentley*, 94 S.W.3d at 579. A statement is an opinion if it is "by its nature, an indefinite or ambiguous individual judgment that rests solely in the eye of the beholder or is otherwise a loose and figurative term." *Palestine Herald-Press Co. v. Zimmer*, 257 S.W.3d 504, 511 (Tex. App.—Tyler 2008, pet. denied); *see also Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 824 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (holding "loose and figurative term employed as metaphor or hyperbole [ ] is an expression of opinion" and not actionable defamation). Whether a statement is a statement of fact or opinion is a question of law. *Backes v. Misko*, 486 S.W.3d 7, 24 (Tex. App.—Dallas 2015, pet. denied). Merely couching a statement as an "opinion" does not mean it is constitutionally protected. *See Tatum*, 554 S.W.3d at 634 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19 (1990)).

**B.    Analysis**

In *Zoanni I*, this Court held that statements 4, 5, and 7 are statements of fact, not statements of opinion. *Zoanni I*, 555 S.W.3d at 331. Having previously resolved these questions of law against Zoanni, we focus our analysis on statements 1, 2, 3, 6, 8, 9, 10, and 11.[19] We conclude those statements are not statements of opinions.

---

[19]    *See Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 929 (Tex. App.—Dallas 2004, pet. denied) (stating "law of the case" doctrine "mandates that the ruling of an

Zoanni's argument that she is merely expressing her opinion when she refers to Hogan as a "pedophile" in statements 6, 8, 9, and 10 is not persuasive. In statement 6, Zoanni implicitly refers to Hogan as a pedophile when she states in her letter to Dr. Edralin, "you have been informed that a father is a pedophile." She makes similar comments in statements 8, 9, and 10, which are found in Zoanni's blog. As concerns statements 6 and 9, whether Dr. Edralin was informed that Hogan was a pedophile and whether Hogan confessed to being a pedophile are verifiable facts. As to statements 8, 9, and 10, a reasonable person reading these statements in Zoanni's blog would understand that Zoanni is making factual assertions—accusing Hogan of being a pedophile. *See Bentley*, 94 S.W.3d at 579 (whether statement is actionable statement of fact or protected expression of opinion depends upon reasonable person's perception of entirety of publication). Whether Hogan is in fact a pedophile is a verifiable fact. *See Schmitz v. Cox*, No. 01-15-00199-CV, 2015 WL 6755427, at *4–5 (Tex. App.—Houston [1st Dist.] Nov. 5, 2015, no pet.) (mem. op.) ("Even assuming that calling someone a 'nut job' does not include an assertion of verifiable fact, claiming that someone is mentally unstable, committed a crime by defacing a campaign sign, and has defaulted on his child support obligations does

appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings unless clearly erroneous") (citing *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003)); *Backes v. Misko*, 486 S.W.3d 7, 24 (Tex. App.—Dallas 2015, pet. denied) (stating whether statement is statement of fact or opinion is question of law).

assert verifiable facts."); *see also Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at \*6 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.) (holding statement, "That guy is a pedophile!  He is a pervert!  Watch your kids— h[e] is a pervert! [ ] Taking pictures of girls, you pedophile!," is defamatory per se).[20]

Statements 1, 2, and 3, reflected in the police report, stating Zoanni "feels strongly there is child pornography on [Hogan's] computers," "feels that her daughter [Mary] is hiding some kind of sexual assault and will 'flip' when asked about it," and "it was quite possible [Hogan] was involved in child porn but we had no proof" are also verifiable facts.  Whether there is child pornography on Hogan's computers is a verifiable fact as demonstrated by Trapp's testimony that he found pornography on his church computer and Hogan confessed to Trapp that the pornography belonged to him.  Whether Hogan is "involved in child porn" or Mary "is hiding some kind of sexual assault" are also verifiable facts and allegations law

---

[20] We note that pedophilia is a form of sexual deviance, and an individual may be diagnosed as suffering from this condition. *See In re Commitment of S.D.*, No. 10-17-00129-CV, 2020 WL 103721, at \*2 (Tex. App.—Waco Jan. 8, 2020, no pet.) ("Dr. Arambula testified that the clinical diagnosis that correlates to Dixon's sexual deviance is pedophilia—a typically chronic condition in which someone is sexually attracted to children and acts on his or her urges and sexual preferences."); *In re Commitment of Smith*, No. 07-17-00147-CV, 2018 WL 5832178, at \*5 (Tex. App.—Amarillo Nov. 7, 2018, no pet.) ("Arambula diagnosed Smith as suffering from pedophilia, a form of sexual deviance."); *see also Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at \*6 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.) (citing dictionary defining "pedophilia" as "psychiatric disorder").  This indicates that whether a person is a pedophile is a verifiable fact.

57

enforcement considered before closing the case. *See Bentley*, 94 S.W.3d at 579 (whether statement is actionable statement of fact or protected expression of opinion depends upon reasonable person's perception of entirety of publication); *see also Durant v. Anderson*, No. 02-14-00283-CV, 2020 WL 1295058, at *21 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op.) (stating "the fact an investigation was initiated shows that the statements were verifiable" in defamation case); *but see California Commercial Inv. Group, Inc. v. Herrington*, No. 05-19-00805-CV, 2020 WL 3820907, at *6 (Tex. App.—Dallas July 8, 2020, no pet.) (holding defendant's statement to police that she "knows very well" that plaintiff staged burglary to steal property was subjective opinion, not verifiable fact, and noting evidence supported opinion).

Although posed as a question, Zoanni's statement to Barker in statement 4 is also actionable as defamation. Statement 4 states: "David Hogan still has severe issues ... Please tell me if you think it[']s right that a minister who is involved in child porn is put back into a church as children[']s pastor after one year visiting another pastor once a month and an online course as his rehab??" Based on the entirety of the publication, a reasonable person would understand that Zoanni is accusing Hogan of being "involved in child porn," an assertion of a verifiable fact. *See Bentley*, 94 S.W.3d at 579 (stating whether statement is actionable statement of fact or protected expression of opinion depends upon reasonable person's perception

of entirety of publication); *see also Backes*, 486 S.W.3d at 26–27 (holding statements on internet posting including "[h]as anyone ever known anyone with [the] disease/issue" of Munchausen–Syndrome–by–Proxy and "[i]f you have STRONG suspicions . . . to whom do you turn them over" were not protected expressions of opinion but were assertions of objectively verifiable facts that were defamatory, namely accusing plaintiff of medical child abuse).

Taken in isolation, Zoanni's assertion in statement 11 that Hogan "has a problem with pre-teens" and "it's sickening" may be construed as an assertion of an opinion. *See Palestine Herald-Press Co.*, 257 S.W.3d at 511 (stating opinion is "by its nature, an indefinite or ambiguous individual judgment that rests solely in the eye of the beholder or is otherwise a loose and figurative term"). But when considered in the context of Zoanni's blog, a reasonable person would understand this to mean that Zoanni is accusing Hogan of engaging in inappropriate conduct with minors, an assertion of a verifiable fact. *See Bentley*, 94 S.W.3d at 579 (stating whether statement is actionable statement of fact or protected expression of opinion depends upon reasonable person's perception of entirety of publication).

We conclude that the challenged statements are assertions of verifiable facts, not opinions, and thus actionable as defamation.

We overrule Zoanni's second issue.

## Mitigation Instruction

In her first issue on remand, Zoanni argues, among other things, that the trial court abused its discretion in failing to include a mitigation instruction in the damages portion of the jury charge because the issue was raised by the written pleadings and the evidence. She argues she was entitled to a mitigation instruction because there was evidence Hogan "did plenty by himself to damage his reputation."[21]

### A.    Standard of Review and Applicable Law

We review alleged charge error for abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or, in other words, when the act is arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

After a jury trial, the trial court must submit a written charge including all "questions, instructions and definitions . . . which are raised by the written pleadings and the evidence." TEX. R. CIV. P. 278. "A trial court may refuse to submit an issue only if no evidence exists to warrant its submission." *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992).

---

[21]    We address the other arguments raised in Zoanni's first issue on remand later in this opinion.

The mitigation of damages doctrine, which is also referred to as the doctrine of avoidable consequences, "requires an injured party to use reasonable efforts to avoid or prevent losses." *E.L. & Associates, Inc. v. Pabon*, 525 S.W.3d 764, 768 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 735 (Tex. App.—Dallas 1988, writ denied)); *Harris Cnty. v. Smoker*, 934 S.W.2d 714, 721 (Tex. App.—Houston [1st Dist.] 1996, writ denied). The doctrine "requires an injured party to exercise reasonable care to minimize [his] damages, if the damages can be avoided with only slight expense and reasonable effort." *Smoker*, 934 S.W.2d at 721. An instruction on mitigation of damages is appropriate when there is evidence of negligence on the part of the plaintiff. *Id.* The instruction is proper "when the negligence complained of merely contributed to or added to the extent of the losses or injuries, but has no part in causing the incident in question." *Hygeia Dairy Co. v. Gonzalez*, 994 S.W.2d 220, 224 (Tex. App.—San Antonio 1999, no pet.) ("In this way, the law seeks to avoid economic waste by denying the wronged party a recovery for such losses as could have reasonably been avoided.").

The party "who caused the loss bears the burden of proving lack of diligence on the part of the plaintiff." *Smoker*, 934 S.W.2d at 721; *see also Hygeia Dairy Co.*, 994 S.W.2d at 224 ("The burden of proving a failure to mitigate is upon the party who caused the loss."). A defendant cannot get a mitigation instruction merely by

61

asserting that a plaintiff failed to mitigate his damages. Rather, a defendant is entitled to a mitigation instruction if the evidence (1) "clearly show[s] that the plaintiff's decision not to mitigate caused further damages," and (2) "sufficiently guide[s] the jury in determining which damages were attributable to the plaintiff's decision not to mitigate." *Formosa Plastics Corp., USA v. Kajima Intern., Inc.*, 216 S.W.3d 436, 459 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) (citing *Hygeia Dairy Co.*, 994 S.W.2d at 225).

A trial court is not required to submit a mitigation instruction if the defendant does not present any evidence of an amount by which the plaintiff's damages were increased by his alleged failure to mitigate. *Smoker*, 934 S.W.2d at 722 (holding trial court did not abuse its discretion by not including mitigation instruction in charge when defendant "did not present any evidence of an amount by which Smoker's damages were increased by her alleged failure to mitigate"); *see also Formosa Plastics Corp., USA*, 216 S.W.3d at 459 (holding trial court did not abuse its discretion by not including mitigation instruction when defendant failed to show plaintiff's damages could be mitigated with minimal effort or expense).[22] While

---

[22] Texas courts have applied the doctrine of mitigation of damages to breach of contract and intentional tort cases. *See Gunn Infiniti, Inc. v. O'Byrne*, 996 S.W.2d 854, 858 (Tex. 1999) (holding "a plaintiff in a DTPA case has the same duty to mitigate damages as in other cases"); *E.L. & Associates, Inc. v. Pabon*, 525 S.W.3d 764, 768 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (applying doctrine in breach of contract case); *Perez v. Perez*, No. 13-11-00169-CV, 2013 WL 398932, at *13 (Tex. App.—Corpus Christi–Edinburg Jan. 31, 2013, no pet.) (mem. op.)

proving an exact amount of damages attributable to a plaintiff's alleged failure to mitigate may not be necessary in cases involving unliquidated damages, there still must be "some evidence in the record from which the jury can make a reasoned calculation about losses from [a plaintiff's] failure to mitigate." *Hygeia Dairy Co.*, 994 S.W.2d at 226. "Evidence must be developed which clearly shows a plaintiff's failure to mitigate caused further damages, and the evidence must be sufficient to guide the jury in determining which damages were attributable to a plaintiff's failure to mitigate." *Id.* "[A] plaintiff's own evidence can be used to provide the requisite framework." *Id.* at 225.

## B. Analysis

During the charge conference, Zoanni objected to the trial court's failure to include a mitigation instruction in the jury charge. She tendered the following proposed mitigation instruction by dictation into the record:

> Do not include any amount for any condition resulting from the failure, if any, of Lemuel David Hogan to have acted as a person of ordinary prudence would have done under the same or similar circumstances in caring for and treating his injuries, if any, that resulted from any occurrences in question.

---

(applying doctrine in personal injury suit); *see also* Restatement (Second) of Torts § 918 (Am. Law Inst. 1979) (stating general rule that "one injured by the tort of another is not entitled to recover damages for any harm that he could have avoided by the use of reasonable effort or expenditure after the commission of the tort"). We have not found, and Zoanni has not cited, any Texas case applying the doctrine of mitigation of damages in a defamation suit.

Zoanni argued that mitigation was a "defense at common law. I believe I have that defense under Chapter 33 Civil Practice and Remedies Code, and I think I get that defense under [the] Defamation Mitigation Act." The trial court denied Zoanni's request to include the instruction in the charge.

Zoanni argues the trial court abused its discretion by failing to include the proposed mitigation instruction because "Hogan did plenty by himself to damage his reputation."[23] She argues that:

> it was Hogan who showed the police report to his fiancé and who filed suit to modify custody and amplified the importance of the blog he hated . . . . Of the few folks Mr. Hogan testified about shunning him in public, how many did it because of his admitted wrongful behavior or his formerly secret activities versus because of the blog? The jury was not instructed to decrease damages according[ly], which led to an improper verdict and judgment.

Zoanni raises no further arguments in her appellate brief in support of her mitigation argument.

Damages resulting from a failure to mitigate are "not proximately caused by the wrongdoer's acts or omissions, but by the injured person's own subsequent negligence, and are thus not recoverable from the wrongdoer." *Hygeia Dairy Co.*, 994 S.W.2d at 225 (quoting *Moulton v. Alamo Ambulance Serv., Inc.*, 414 S.W.2d 444, 449 (Tex. 1967)). In other words, once injured by a wrongdoer, a plaintiff has

---

[23] Zoanni argues there is a "summary list" of how Hogan damaged his reputation with "proof of most."

a duty to mitigate (avoid) further, subsequent damages. Most of the evidence Zoanni relies on to support her request for a mitigation instruction concerns Hogan's conduct before she made the alleged defamatory statements, such as Hogan's alleged conduct in (1) "consistently viewing pornography, particularly voyeuristic porn," (2) "viewing pornography on church computers," (3) "peeking into women's dressing rooms," (4) "secretly planting cameras to record sexual activity of his friend and fellow minister," (5) "secretly removing an attic fan to peer into a bathroom to see naked girls," (6) "voluntarily placing himself on one-year probation as a minister," and (7) "calling sex hotlines." Because this alleged conduct occurred before Zoanni allegedly defamed Hogan, evidence of such conduct does not inform whether Hogan failed to mitigate his damages by his "own subsequent negligence" and thus does not support a mitigation instruction.[24] *See Hygeia Dairy Co.*, 994 S.W.2d at 225 (explaining evidence must clearly show plaintiff's failure to mitigate caused "further damages" that resulted from "injured person's own subsequent negligence"); *cf. Pulaski Bank & Tr. Co.*, 759 S.W.2d at 735 (stating doctrine of mitigation of damages applies "only if the victim of the wrongdoer's act has

---

[24] Zoanni argues that Hogan failed to "mitigate his damages," but the import of her claim appears to be not that Hogan failed to mitigate his damages after Zoanni made the defamatory statements, but rather that Hogan failed to establish that the alleged defamatory statements resulted in his claimed damages.

knowledge of the fact which makes avoidance of the consequences necessary, and if the damages can be avoided with only slight expense and reasonable effort").

In support of her mitigation argument, Zoanni also argues that Hogan did "plenty by himself to damage his reputation" because it was Hogan who "showed the police report to his fiancé" and who "filed suit to modify custody [of Mary] and amplified the importance of the blog he hated" containing the purportedly defamatory statements. This argument too fails to support a mitigation instruction. Zoanni discussed the filing of Hogan's petition to modify custody of Mary on her Facebook page and in her blog. There is no evidence Hogan directed anyone to Zoanni's blog or otherwise attempted to amplify the importance of her blog or publicized his custody suit resulting in further damages. There is also no evidence that Hogan incurred any further damages by showing the police report to his fiancé. *See Formosa Plastics Corp., USA*, 216 S.W.3d at 459 (stating defendant not entitled to mitigation instruction unless evidence "clearly show[s] that the plaintiff's decision not to mitigate caused further damages").

In sum, Zoanni did not develop evidence that Hogan's alleged "failure to mitigate caused further damages," nor was the evidence "sufficient to guide the jury in determining which damages were attributable to [Hogan's] failure to mitigate." *See Hygeia Dairy Co.*, 994 S.W.2d at 225. Zoanni was thus not entitled to a mitigation instruction. *See id.* (stating defendant not entitled to mitigation

instruction "merely by asserting that a plaintiff failed to mitigate damages" and requiring evidence clearly showing alleged failure "caused further damages" and "sufficient to guide the jury in determining which damages were attributable to a plaintiff's failure to mitigate"); *see also Smoker*, 934 S.W.2d at 722 (holding trial court did not abuse its discretion by not including mitigation instruction in charge when defendant failed to show plaintiff's damages could be mitigated with minimal effort or expense, plaintiff's decisions caused further damages, or produce any evidence from which jury could determine which damages were attributable to plaintiff).

We overrule the portion of Zoanni's first issue pertaining to the trial court's failure to include a mitigation instruction in the charge.

## Publication

In her third issue on remand, Zoanni argues there is legally insufficient evidence "that Zoanni published any of the complained-of police report statements" listed under Jury Question 5. Jury Question 5 lists two statements from Deputy Nelson's police report and asks the jury to determine whether Zoanni published the "statements with law enforcement personnel to other people." The jury was instructed that "publish" means "intentionally or negligently to communicate the

matter to a person other than [Hogan] who is capable of understanding its meaning." The jury answered "Yes" as to publication.

Zoanni argues that Hogan cannot recover damages based on either statement because there is no evidence she published the police report or her statements in the police report to other people. *See Anderson*, 550 S.W.3d at 617–18 (stating actionable defamation requires among other things, publication of false statement of fact to third party). Assuming without deciding there is legally insufficient evidence to support the jury's findings of publication under Jury Question 5, we cannot reverse unless Zoanni demonstrates harm. TEX. R. APP. P. 44.1(a); *see Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex. 2009) (stating that even if trial court abuses its discretion, "the complaining party must still show harm on appeal to obtain a reversal"). An error is harmful if it "probably caused the rendition of an improper judgment" or "probably prevented the appellant from properly presenting the case to the court of appeals." TEX. R. APP. P. 44.1(a).

Zoanni argues that because there is no evidence either statement was published, "neither liability nor damages for the defamation claim based on this theory can be sustained." She further contends that "the judgment must be reversed and rendered as to this claim and remanded with respect to the issue of calculating damages" because the "publication issue infect[ed] the jury's answer" under Jury Question 10 Part A, where "the jury awarded [Hogan] $900,000 in damages."

68

The thirteen defamatory statements were separated and presented to the jury in two separate parts in the damages portion of the jury charge. Jury Question 10 Part A listed eight statements, and Jury Question 10 Part B listed the remaining five statements.[25] The jury awarded Hogan $900,000 in compensatory damages for the statements in Jury Question 10 Part A consisting of (1) $600,000 for past and future damage to his reputation, and (2) $300,000 for past and future mental anguish. And it awarded Hogan $1,200,000 in compensatory damages for the statements in Jury Question 10 Part B consisting of (1) $850,000 for past and future damage to his reputation, and (2) $350,000 for past and future mental anguish.

The two alleged unpublished statements under Jury Question 5 were listed under Part A of Jury Question 10, along with six other listed statements. Part A of Jury Question 10 included a single line for each category of damages (past mental anguish, future mental anguish, past injury to reputation, and future injury to reputation) for all eight listed statements. No one objected to the submission of this question and neither party argues on appeal that the submission of the broad-form question on damages was improper. Because the damages question was presented to the jury this way, we have no ability to review the legal sufficiency of the evidence

---

[25] The parties did not explain in their briefs, nor could they explain during oral argument, why the statements were separated and presented to the jury in two separate damage questions. Nor did Zoanni argue that the statements, either collectively or as listed, presented a single theory of liability.

to support any particular award of damages as it concerns the two challenged statements, nor can we say Zoanni was harmed by the submission of these two statements to the jury.

The Texas Supreme Court's opinion in *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213 (Tex. 2019) is instructive. In *Bombardier*, the buyers of an aircraft sued the seller, Bombardier, for breach of contract, breach of express warranty, and fraud based on Bombardier's failure to disclose to the buyers that the aircraft's left engine had been installed on two other aircrafts and designated as "repaired" before being installed on the buyers' aircraft. *Id*. at 18. The plaintiffs' aircraft appraisal expert testified that the plaintiffs had incurred $2,694,160 in damages, which included the diminution in value of the aircraft due to the repaired engine plus a reduction for loss of value in the engine's warranties. *Id*. at 227. Question four of the jury charge asked the jury to determine "what sum of money would reasonably compensate the plaintiffs for Bombardier's fraud, and it contained a single answer blank." *Id*. at 228. "The parties agreed to this damages question and the single answer blank, and neither party objected." *Id.* The jury found in favor of the plaintiffs on both the breach of contract and fraud claims. Under the doctrine of election of remedies, the plaintiffs elected to recover on the fraud claim. *Id*. at 219. The jury awarded $2,694,160 in actual damages for fraud. *Id.*

70

On appeal, Bombardier argued that the award of $2,694,160 in fraud damages was based solely on the expert's conclusory opinion that the aircraft had sustained a diminution in value due to its engine history and a loss in the value of the engine's warranty. *Id.* at 222. The diminution in value, according to the expert, "was $2,694,160—$1,985,000 excluding the [$709,160] reduction for loss of warranty, which is about 10% of the purchase price." *Id.* at 227. The Supreme Court held that the expert's testimony was not conclusory. *Id.* at 228. Turning next to Bombardier's no-evidence challenge as to the "$709,160 in damages for the lost engine warranties," the court explained:

> Question four of the jury charge asked what sum of money would reasonably compensate the plaintiffs for Bombardier's fraud, and it contained a single answer blank. [The expert] provided the jury with a suggested sum of $2,694,160, which included both the diminution in value plus a reduction for lost value in the warranties. But the jury was not asked to provide specific dollar amounts to award damages for diminution in value and for lost value in warranties. The parties agreed to this damages question and the single answer blank, and neither party objected. As a consequence, we cannot determine the exact portion of the damages award that compensated the plaintiffs for warranty issues, and we cannot separate it from diminution-in-value damages, which we have already determined were supported by [the expert's] non-conclusory testimony. . . Therefore, we do not have the ability to review the legal sufficiency of the evidence to support any particular award of damages to compensate for fraud as it relates to the engine warranties without disturbing the jury's entire answer to question four.

*Id.* at 228–29. The court thus "decline[d] to disturb the entire actual damages award under jury charge question four because damages for diminution in value and for

71

loss in warranty value were combined into a single question with one answer blank, to which the parties agreed." *Id.* at 233–34.

We are faced with a similar situation here. Even if we conclude no evidence supports the publication of the two challenged statements, as Zoanni contends, the award of damages under Jury Question 10 Part A was not based exclusively on the two challenged statements. Rather, the jury awarded damages under Jury Question 10 Part A based on eight listed defamatory statements.[26, 27] Because as in *Bombardier*, the jury was presented with an agreed broad-form question on damages for Jury Question 10 Part A based on eight listed defamatory statements, we cannot determine the exact portion of the damages award that compensated Hogan for past and future mental anguish damages or past and future loss of reputation for the two challenged statements from those amounts awarded for the remaining six statements. *See id.* at 228 (holding submission of unobjected to broad-form damages question precluded court's ability to review legal sufficiency of evidence to support award of

---

[26]    We already overruled Zoanni's third issue, holding that all eight statements presented under Jury Question 10 Part A are statements of verifiable fact and thus actionable as defamation. *See Bentley v. Bunton*, 94 S.W.3d 561, 583–84 (Tex. 2002) (stating defamatory statements are assertions of verifiable fact); *See Anderson v. Durant*, 550 S.W.3d 605, 617–18 (Tex. 2018) (stating actionable defamation requires publication of false statement of fact to third party).

[27]    Although Zoanni also argues there is legally and factually insufficient evidence supporting the award of damages as to all eight statements listed under Jury Question Part A, for the reasons discussed in the next section, we overrule her challenge to the sufficiency of the evidence supporting the damage awards.

damages for one of two measures of damages and declining to "disturb[] the jury's entire answer" to damages question).

Consequently, we cannot, without disturbing the jury's entire answer on damages under Part A of Jury Question 10, conduct a meaningful sufficiency review of the evidence supporting an award of damages for the two statements listed under Jury Question 5 or discern whether Zoanni was harmed by the inclusion of these statements in the jury charge and the jury's finding of "Yes" under Jury Question 5 for each statement. *See Castillo*, 279 S.W.3d at 667 (citing TEX. R. APP. P. 44.1(a)) (stating courts of appeal cannot reverse trial court's judgment unless trial court's error was harmful). Because the jury's findings of liability and its award of damages under the parties' agreed broad form question on damages in Jury Question 10 Part A were based on more than the two statements under Jury Question 5, Zoanni has not demonstrated she was harmed by the submission of these statements to the jury. *See id.* (stating that even if trial court abuses its discretion, "the complaining party must still show harm on appeal to obtain a reversal").

We overrule Zoanni's third issue.

### Actual Damages

Separate from her argument regarding the failure to include a mitigation instruction, which we have already addressed, Zoanni challenges the award of actual damages in her first issue on remand arguing (1) there is "no legally sufficient

73

evidence to support them," (2) there is "no factually sufficient evidence to support them," (3) they are "manifestly too large," and (4) "[p]unitive damages were impermissibly awarded as actual damages." Hogan argues Zoanni waived her issue due to inadequate briefing because "there is no statement of facts discussing this issue, [and] there is no discussion in the argument portion of the brief discussing this issue." Hogan also argues that "assuming the undersigned even understands what is even being argued, it was not preserved in the trial court, and there is evidence to support the findings at issue."

## A. Jury Charge

Jury Question 10 divided the thirteen alleged defamatory statements into two parts—Part A listing eight statements, and Part B listing the remaining five statements. Because the parties did not object to the separation of defamatory statements into Parts A and B or the separate award of damages for Parts A and B, we must evaluate the sufficiency of the evidence supporting the damage awards separately, as submitted in the charge. *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 & n.30 (Tex. 2005) (explaining courts measure sufficiency of evidence by charge as submitted where there were no objections to jury charge). Thus, in this instance, we must separately evaluate the sufficiency of the evidence supporting the awards of damages for past and future mental anguish and past and future loss of reputation under Part A, separately from the sufficiency of the evidence

74

supporting the awards of damages for past and future mental anguish and past and future loss of reputation under Part B. *See id.*

## B.    Analysis

Texas Rule of Appellate Procedure 38.1(i) requires an appellant's brief to contain a clear and concise argument with appropriate citations to authorities and the record. *See* TEX. R. APP. P. 38.1(i). The failure to provide a substantive and meaningful analysis applying the law to the facts waives a complaint on appeal. *See Encinas v. Jackson*, 553 S.W.3d 723, 728 (Tex. App.—El Paso 2018, no pet.) (holding appellant waived argument by "provid[ing] no citation to authority, nor appl[ying] applicable law to the facts of the case in support of her second issue"); *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.) ("A failure to provide substantive analysis of an issue waives the complaint."); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[P]arties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions."). "An appellate court has no duty—or even right—to perform an independent review of the record and applicable law to determine whether there was error." *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). "Were we to do so, . . . we would be abandoning our role as neutral adjudicators and become an advocate for that party." *Id.*

75

In the two-page "Statement of Facts" section of her opening brief, Zoanni introduces the parties in this case. Rather than including a detailed discussion of the testimony and other evidence admitted during the seven-day jury trial with supporting citations to the eleven-volume reporter's record, Zoanni states:

> Each person has a significantly different view of numerous events. The standards of review on this appeal compel the court to review the entire record on a variety of legal issues. Therefore, rather than present the court with the standard statement of facts with record citations and force the court to bounce back and forth like a ping pong ball between the competing briefs, Mrs. Zoanni is instead condensing her statement of facts to what will hopefully be much more useful for the court.

Zoanni summarizes her argument for her issue on damages as follows:

> The damage verdict totals $2,100,000: theoretically in mental anguish and loss of reputation, but in reality in punitives. That is a constitutional violation. There is no evidence that meets the frequently cited tests for proof of the existence or amounts of those damages. There is therefore insufficient evidence, and they are also manifestly too large and unjust.

Zoanni then sets forth the standards for legal and factual sufficiency and the law applicable to mental anguish damages. But rather than addressing the jury's separate findings of past and future mental anguish and past and future injury to reputation for Jury Question Parts A and B separately, Zoanni combines her sufficiency arguments. Zoanni provides minimal citations to the reporter's record, citing two hundred pages of testimony from four witnesses who "testified to some extent on the issue of damages."

## 1.    Legal Sufficiency

Zoanni first argues there is no evidence to support the jury's award of damages for past and future loss of reputation and past and future mental anguish, and that the awards for mental anguish and loss of reputation impermissibly include punitive damages.

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When conducting a legal sufficiency review, we "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807; *see also Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822. Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony and may choose to believe one witness and to disbelieve another. *Id.* at 819.

A challenge to the legal sufficiency of the evidence by a party who did not have the burden of proof on that issue will be sustained if, among other things, the evidence offered to prove a vital fact is no more than a scintilla or the evidence conclusively establishes the opposite of a vital fact. *See id.* at 810; *see also Kroger*

*Texas Ltd.*, 216 S.W.3d at 793. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Kroger Texas Ltd.*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

### (a) Mental Anguish

Zoanni argues there is no evidence to support the award of mental anguish damages because Hogan's testimony concerning the impact the alleged defamatory statements had on his emotional well-being did not rise to the level of compensable mental anguish in the past or future.

A damage award for mental anguish will survive a legal-sufficiency challenge when the record bears "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in the plaintiff[']s daily routine," or when the record demonstrates "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Anderson*, 550 S.W.3d at 619 (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co.*, 901 S.W.2d at 444.

"Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011). To support an award for future mental anguish, a plaintiff must demonstrate a reasonable probability that he would suffer compensable mental anguish in the future. *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008). "[S]ome types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish," including events that "have demonstrated a threat to one's physical safety or reputation or involved the death of, or serious injury to, a family member." *Parkway Co.*, 901 S.W.2d at 445; *see also Capps v. Nexion Health at Southwood, Inc.*, 349 S.W.3d 849, 871–72 (Tex. App.—Tyler 2011, no pet.) (affirming mental anguish damages for wrongful termination in part because "wrongdoing that threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish").

Hogan testified that Zoanni's defamatory statements had a devastating impact on his emotional well-being and "systematically ruined [his] life, privately and professionally." According to Hogan, Zoanni's defamatory statements damaged his reputation, created a threat to his and his daughter Mary's safety, and caused many of his long-time friends and other community members, including parents and

79

teachers at Mary's school, to publicly shun him. Hogan testified that he "regularly feared for [his] own safety" after Zoanni began blogging and he wanted his wife Amy to get a license to carry a concealed handgun for "her personal safety." According to Hogan, "every Friday night in the middle of the night" for about two months after Zoanni began blogging, "somebody would leave some form of dead animal on my front porch." Hogan testified that someone also tried to break into his home a week and a half after the blog started. When asked if he "ever feared for [his] safety and [Mary's] safety because people think [he is] a child molesting pedophile," Hogan testified:

> Absolutely. I mean, the comments on the blog, you know, state that there was–there were other blogs that began blogging about her blog and then people were commenting on that how that I should be stoned, crucified, how they wished that they could have their shot to take care of me themselves. Friend of [Zoanni's husband] Rick's posted about asking if he and Rick should come and take care of me.

Hogan also testified that Zoanni's defamatory statements not only threatened his reputation, but they did, in fact, harm his reputation. When asked if "anyone has complete trust having you as a pastor or even when they see you out in public anymore," Hogan testified, "No. You can't unring that bell. There will always be the wonder." According to Hogan, "Being called a pedophile, whether you are or aren't, is incredibly damaging to your reputation; and I can tell you that firsthand."

Hogan testified about the impact Zoanni's defamatory statements had on his interaction with others. He testified, for example, that he and his family saw former

80

church members, the Allens, at a local restaurant the night before trial. Although Hogan had known the Allens since he was a child and had grown up with their son, the Allens "walked in, walked right past us, saw us, wouldn't even look at us after that. It's still ongoing. It's not changed one bit." Hogan testified that the Allens "had gone to our church forever until [Zoanni] started blogging and [Ralph Allen] even began to comment on the blog that he believed every word."

Zoanni acknowledged that some of her statements had the potential to injure someone's reputation. When asked if posting "something like a pastor at Spring First Church has a problem with preteens and it's sickening," injures a pastor's reputation, Zoanni answered, "Potentially." Zoanni also agreed that the statement in her blog referring to Hogan as a "confessed voyeur pedophile" could "potentially" injure Hogan's occupation and reputation. When asked about the claim she made in her letter to Barker, Zoanni testified that a pastor's reputation and occupation could "potentially" be injured if someone thought the pastor had a sex crimes case pending against them.

When asked about the impact Zoanni's defamatory statements had on public outings with his family, Hogan testified that "especially when the blog was continuing to go on, I was afraid to walk anywhere in public and afraid that you'd see somebody you know, just to see how they're going to respond to you." He described a recent incident when he ran into friends from church that he used to

81

mentor and there was "this awkward moment of do we go talk to them?" According to Hogan, "It's just awkward, and that happens day after day." Hogan testified, "That is a regular occurrence. Happened this week. It's everywhere we go." Hogan testified that before Zoanni began blogging, he was very proud of his name, but afterwards, he worries how people will react when he tells people his name is "David Hogan."

Hogan testified that he lost many friends because of Zoanni's defamatory statements, and many people with whom he had grown up and been close to also left the Church after Zoanni began blogging. According to Hogan, the loss of many of his close friends has "probably been one of the most difficult things to go through in relation to all of this" and left him feeling "very, very, isolated." Hogan testified about the impact the loss of his friends had on him:

> I think that was one of the tough things, too, is people that you thought would be loyal to you and give you the benefit of the doubt and believe the best and you call, you text, and you don't get a response and people don't know how to respond and I soon understood where they're coming from and I don't want to put them in a position to feel awkward and feel the tension, so you end up just, a lot of times, you know, either going out by yourself or sitting at home or just, you know, being with my family.

Hogan testified that he lost sleep and was anxious to the point of feeling physically ill because of Zoanni's statements. According to Hogan, he spent many sleepless nights after Zoanni began blogging and when asked if there were any days when he did not want to get out of bed in the morning, Hogan testified:

82

Absolutely. Every day. Just didn't want to have to see anybody, didn't want to have people questioning about it, didn't want to go to work. You know, the weeks I have [Mary], I mean, just did the best I could to not try to let her see those emotions outwardly; but inside, just gut-wrenching.

Hogan testified that while Zoanni was actively blogging in February and March 2014, "the anticipation, I guess, of wondering what's she going to say today, what new thing is going to be in there that's inaccurate, and the anxiety that comes along with that is overwhelming." According to Hogan:

Because every time something new gets added to it, people start calling the church, people start texting my mom and dad; and every day it's just the sense of panic that goes over you like, what are you going to do? There's no—it's very hopeless and helpless feeling that is physically overwhelming.

Hogan testified that Zoanni's blogging made him so anxious that he felt physically ill and "it doesn't go away." According to Hogan, "It's not like it subsided. I went to bed feeling that way, wake up in the middle of the night and you're—I remember so many nights waking up in the middle of the night and thinking, Please tell me this is just a bad dream, and then realizing this is my reality every single day."

Zoanni's statements also negatively impacted Hogan's involvement with Mary's education. Hogan had been "very involved" at Mary's elementary school before Zoanni made the defamatory statements and he visited the school regularly to show his support for Mary and have lunch with her. Although Hogan "tried to

stay very involved," Hogan was shunned routinely by teachers and other parents when he visited Mary's school after Zoanni made her statements and "being on the school campus after the blog came out was just unbelievable."

Martin and Hogan's wife, Amy, provided testimony corroborating Hogan's claims of mental anguish. When asked whether Hogan had suffered mental anguish, Amy testified that attending events at Mary's school continues to be a challenge for Amy and Hogan because they "never know of what parents are aware of, what's been said, or what's been read or told." When Hogan attended school events after the blog started, no one spoke to him and "it was like very apparent that they all knew what was going on." According to Amy, teachers and other parents would interact with Zoanni, but they completely ignored Hogan. The Church also banned Hogan from attending or participating in events that involved children after Zoanni began blogging. According to Amy, Hogan was "upset" and "devastated" by the Church's decision because those were "things that he really enjoyed doing."

Amy also testified that Hogan's long-time friends and acquaintances from Church publicly shunned him after Zoanni made the defamatory statements and she described a recent incident when they encountered some of Hogan's high school friends at a local restaurant. According to Amy, Hogan's former friends refused to acknowledge him when they walked in and after they were seated, the former friends pointed at Hogan's table and were "like blatantly having conversations about him

and, I mean, he was devastated." Amy's friends also do not want anything to do with Hogan and she and Hogan generally do not invite other children over to their home.

Amy also testified about the impact Zoanni's allegations have had on Hogan's behavior. Although they are married, Hogan leaves the bathroom when Amy showers or undresses, and he gets out of bed if her young daughter climbs into bed with them because he does not want to do anything that could be misconstrued and used as the basis for further allegations of misconduct, like those raised against him by Zoanni.

Martin and Amy also testified that Zoanni's allegations threatened to harm, and in fact, did harm Hogan's reputation in the community. Amy testified that Hogan's reputation in the community at the time of trial was a one on a scale of one to ten. Martin, Hogan's friend and Church board member, testified that allegations that a youth pastor is "involved in child molestation" can "destroy a church" and "destroy [the youth pastor's] reputation, their livelihood, and it's something that stays with them for their life. It doesn't go away." According to Martin, people within the Church began talking about removing Hogan from his position as the Church's youth pastor based on the allegations Zoanni made against Hogan in her letters to Church leadership, including the letter Zoanni sent to Barker. Martin testified that Zoanni's statements created a "real fear" that Hogan would be removed

as youth pastor because the Church would not do anything to risk the safety and well-being of the children.

According to Martin, Hogan's reputation in the community before Zoanni began making defamatory statements about him was a ten on a scale of one to ten. Martin testified that after Zoanni began blogging, people who had been members of the Church for generations and friends of the Hogan family left the Church, church employees did not want to work with Hogan, and several church employees quit. According to Martin, Hogan's reputation was either a one or zero at the time of trial. Martin testified that Hogan "can't go anywhere without running into someone that knows about it, has read the blog, has heard about it from the church. So his reputation has been pretty much shot."

The jury reasonably could have inferred that Hogan suffered mental anguish based on testimony from Hogan, Amy, and Martin that Zoanni's statements jeopardized Hogan's personal safety and reputation. *See Parkway Co.*, 901 S.W.2d at 445 (stating that evidence of threats to one's physical safety or reputation "support an inference that the injury was accompanied by mental anguish"); *see also Capps*, 349 S.W.3d at 871–72 (stating "wrongdoing that threatens a person's reputation is sufficient to support an inference that the resulting injury was accompanied by mental anguish").

Hogan also testified to specific facts tending to show that he experienced a substantial disruption in his daily routine due to the defamatory statements. The evidence reflects that Hogan lost many close, long-time friends because of Zoanni's statements. Hogan's wife's friends also do not want to associate with him, and he and his wife do not invite children to their home. Hogan testified that he feels "very, very isolated" and rather than spending time with friends as he would have done in the past, he ends up "either going out by [himself] or sitting at home or just, you know, being with my family." Hogan testified he cannot go out in public without running into someone from his close-knit community who has read the defamatory statements, and he is routinely shunned by former friends and acquaintances. The record also reflects that Hogan, a former children's pastor, was "upset" and "devastated" when Church leadership prohibited him from attending Church events involving children because of Zoanni's defamatory statements. Despite being involved in Mary's school before Zoanni's statements, Hogan cannot attend school functions without being shunned by teachers and other parents. Hogan thus provided more than "generalized, conclusory descriptions of how an event affected" him. *Anderson*, 550 S.W.3d at 619. This is sufficient evidence to support the jury's finding of past mental anguish. *See Bentley*, 94 S.W.3d at 606 (holding plaintiff who testified defamatory statements "had cost him time, deprived him of sleep, caused him embarrassment in the community in which he had spent almost all of his life,

87

disrupted his family, and distressed his children at school" provided sufficient evidence of mental anguish).

With respect to future mental anguish, Hogan testified that long-time friends and Church members he had known since he was a child began treating him differently after Zoanni made her alleged defamatory statements and people continued to shun him publicly, including at restaurants and at Mary's school. Hogan and Amy described some of these incidents during their testimony. Based on evidence that Hogan suffered mental anguish in the past and continued to experience mental anguish as of the time of trial, the jury reasonably could have concluded that Hogan would continue to suffer mental anguish in the future. *See Patel v. Hussain*, 485 S.W.3d 153, 182 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (stating jury can infer that mental anguish suffered in past is indication mental anguish will continue in future).

Viewing the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we hold there is legally sufficient evidence establishing Hogan suffered past mental anguish and demonstrating a reasonable probability that Hogan would suffer compensable mental anguish in the future. *See City of Keller*, 168 S.W.3d at 822. We thus overrule Zoanni's legal sufficiency challenge to the existence of compensable past and future mental anguish.

To sustain a jury award for mental anguish damages in the defamation context, there must be not only evidence of compensable mental anguish but also some evidence justifying the amount awarded. *Bentley*, 94 S.W.3d at 606 (citing *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)). For the reasons discussed later in this opinion, we overrule Zoanni's challenge to the amounts of damages awarded for past and future mental anguish.

### (b)  Reputation

Zoanni argues there is no evidence supporting the award of damages for past or future loss of reputation because no witness testified that they thought less of Hogan based on Zoanni's defamatory statements.

"[E]vidence of loss of reputation should be more than theoretical." *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017) (citing *Burbage v. Burbage*, 447 S.W.3d 249, 261 (Tex. 2014)). "Showing that the community was aware of and discussed the defamatory statements is not enough; there must be evidence that people believed the statements and the plaintiff's reputation was actually affected." *Brady*, 515 S.W.3d at 887 (citing *Burbage*, 447 S.W.3d at 261–62). A plaintiff need not identify a specific person who thinks less of him because they believed the defamatory statements. *See Brady*, 515 S.W.3d at 887 (holding that witness testimony that plaintiff had good reputation before defamatory statements were

made in article and that "people in the community that had a negative impression of [plaintiff] after this article" was sufficient evidence of loss of reputation).

As already discussed, there is some evidence that Zoanni's defamatory statements threatened to harm and did harm Hogan's reputation. In addition to that testimony, Hogan testified that approximately seventy-five people in the executive presbytery of the general counsel read Zoanni's February 5, 2014 letter to Pastor Tim Barker containing defamatory statements and they thought less of him as a result, including James Bradford, George Wood, and Charles Crabtree. Although he did not know how many people had seen the statements Zoanni published on her Facebook page, Hogan testified that he knew the names of some of the people who read Zoanni's blog. He testified that there was no way to know how many people saw the defamatory statements because "it was a public post, and it was being shared and liked and commented on." When asked if he could "name one person who [thought] less of [him] because of the word 'filmed' in [Zoanni's] post," Hogan testified, "My answer would be all of them." Hogan also testified that Ralph Allen, a former Church member Hogan had known since he was a child, stopped attending Church after Zoanni started blogging and "comment[ed] on the blog that he believed every word."

Martin and Amy, Hogan's wife, provided testimony corroborating Hogan's claim of reputational damage. Martin testified that before Zoanni's allegations

90

against Hogan, Hogan's reputation in the community was a ten on a scale of one to ten. When asked to assess Hogan's reputation in the community after Zoanni accused him of "child pornography, pedophilia, and even sexually assaulting his own daughter," Martin testified, "Right now his reputation is one. Low. It's zero." According to Martin, Zoanni's correspondence with the Assemblies of God in which she accused Hogan of being a pedophile hurt his reputation and his occupation as a pastor. Martin testified that when Zoanni began blogging:

> It was terrifying. It rippled through the whole church. It affected every ministry in the church. People began to leave. Families began to separate. My own son and his daughter took their kids out of youth [group] and left the church because they didn't want to wait to determine if there was—if there was truth in the blog. They didn't want to take the chance that their children would be hurt. So they left.

Martin testified that allegations that a youth pastor is "involved in child molestation" can "destroy a church" and "destroy [the youth pastor's] reputation, their livelihood, and it's something that stays with them for their life."

Amy also testified that Hogan had a good reputation in the community before Zoanni began blogging. When asked what she thought Hogan's "reputation is in the community right now after Ms. Zoanni's blog was posted," Amy testified, "Ten being the best? A one." She also testified that after Zoanni's defamatory statements were published, former Church members, youth group members, and Hogan's high school friends routinely ignored Hogan in public.

Zoanni, who acknowledged that some of her statements had the potential to injure someone's reputation and testified that she made her allegations against Hogan because she wanted him removed from his position as youth pastor, argues there is no evidence Hogan suffered reputational damage because no witness testified that he thought less of Hogan as a result of the defamatory statements. But a plaintiff need not identify a specific person who thought less of him as a result of a defamatory statement or bring forth a witness to testify that his opinion of the plaintiff lowered after hearing about or reading the alleged defamatory statement to establish loss of reputation. *See Brady*, 515 S.W.3d at 887–88 (holding there was legally sufficient evidence of loss of reputation based on witness testimony that "people in the community [] had a negative impression of [plaintiff] after this article"). Moreover, contrary to Zoanni's assertions, Hogan testified that specific individuals, namely James Bradford, George Wood, Charles Crabtree, and Ralph Allen, read Zoanni's defamatory statements and thought less of him as a result. *See id.* at 887 (stating loss of reputation requires "evidence that people believed the statements and the plaintiff's reputation was actually affected"). There was thus legally sufficient evidence that Hogan suffered reputational loss in the past as a result of Zoanni's defamatory statements.

With respect to the legal sufficiency of the evidence supporting the award of reputational damage in the future, Hogan presented testimony that he continued to

92

encounter people who thought less of him because they had read Zoanni's blog or other defamatory statements. Martin testified that at the time of trial, Hogan "can't go anywhere without running into someone that knows about it, has read the blog, has heard about it from the church. So his reputation has been pretty much shot." Hogan and Amy also testified about recent encounters demonstrating that people who had read one or more of Zoanni's defamatory statements and believed her statements continued to shun Hogan publicly. According to Hogan, he and his family saw the Allens the night before Hogan testified. Ralph Allen, who had read Zoanni's blog and commented on the blog that he believed "every word," refused to acknowledge Hogan. The jury could infer from the evidence of Hogan's loss of reputation at the time of trial, Zoanni's blog and Facebook page online, and his recent encounters with people who thought less of him because they had read Zoanni's blog or other defamatory statements, that Hogan would continue to suffer reputational loss in the future. *See generally Patel*, 485 S.W.3d at 182 (stating jury can infer from evidence mental anguish at time of trial that plaintiff would continue to suffer mental anguish in the future).

Viewing the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not, we hold there is legally sufficient evidence of past and future damages to Hogan's reputation resulting from Zoanni's defamatory

93

statements. *See City of Keller*, 168 S.W.3d at 822. We overrule Zoanni's challenges to the award of past and future damages to Hogan's reputation.

Zoanni also argues there "is no evidence that justifies the amount of damages awarded" for loss of reputation. Like mental anguish, to sustain a jury award of reputational damage, there must be evidence of both the existence of compensable damage to the plaintiff's reputation and evidence to justify the amount awarded. *See Shamark Smith Ltd. P'ship v. Longoria*, No. 03-14-00698-CV, 2016 WL 1039003, at *2–3 (Tex. App.—Austin Mar. 11, 2016, no pet.) (mem. op.); *Martin v. Beitler*, No. 03-13-00605-CV, 2015 WL 4197042, at *3–4 (Tex. App.—Austin July 7, 2015, no pet.) (mem. op.). For the reasons noted below, we overrule Zoanni's challenge to the amount of damages awarded for past and future loss of reputation.

### (c)     Amount of Damages Awarded

Zoanni argues there is no evidence "to justify the amount of damages awarded" for past and future mental anguish and no evidence that "justifies the amount of damages awarded" for loss of reputation in the past and future.

Zoanni's appellate arguments focus primarily on the aggregate $2,100,000 damages awarded for past and future mental anguish and past and future loss of reputation under Jury Question 10 Parts A and B. Because the parties did not object to the portion of the jury charge dividing the thirteen statements into Parts A and B and submitting them as divided for purposes of damages, we must evaluate the

94

sufficiency of the evidence for damages as submitted in the charge. *See Romero*, 166 S.W.3d at 221 & n.30 (stating courts measure sufficiency of evidence by unobjected-to jury charge).[28] Zoanni did not undertake this analysis. We thus conclude Zoanni waived her challenge to the legal sufficiency of the evidence supporting the amount of the individual awards the jury awarded to Hogan for past and future mental anguish and past and future loss of reputation because she did not provide a meaningful and substantive analysis regarding the sufficiency of the evidence supporting the awards of these damages under Part A separately from Part B, as presented and measured in the jury charge. *See* TEX. R. APP. P. 38.1(i); *see also Romero*, 166 S.W.3d at 221 & n.30 (stating courts measure sufficiency of evidence as presented in jury charge when parties did not object); *Patel*, 485 S.W.3d at 182 (holding appellant who "globally challenge[d] mental anguish damages and [did] not separately challenge the jury's award of future mental anguish damages or cite to authority relevant to future mental anguish damages" waived challenge to award of future mental anguish damages on appeal).[29]

---

28  While Zoanni objected to the trial court's failure to include a mitigation instruction, she did not object to the separation of the defamatory statements and corresponding damage awards into Parts A and B in Jury Question 10.

29  Zoanni also fails to cite any authority setting forth the law applicable to future mental anguish. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "appropriate citations to authorities"). While she includes citations to authority regarding past mental anguish, her efforts to apply the law to the facts of this case are hampered by her conclusory discussion of the evidence presented at trial and her

Zoanni also argues that the total damages awarded to Hogan for past and future mental anguish and past and future loss of reputation in Jury Question 10 impermissibly included punitive damages. But the issue of punitive damages was tried separately, and the jury awarded no damages to Hogan in the form of punitive damages. Zoanni points to the arguments of Hogan's trial counsel, which Zoanni contends indicate Hogan's counsel was advocating for the jury to award Hogan more than just reasonable compensation for his actual injuries. According to Zoanni, Hogan's arguments and negative testimony admitted about her at trial caused the jury to award Hogan what amounts to punitive damages in lieu of actual damages and this "is a constitutional violation." But Zoanni fails to cite relevant authorities on this point or provide any guidance with respect to how such issues should be evaluated.[30] *See Encinas*, 553 S.W.3d at 728 (holding appellant waived argument

---

failure to include a statement of facts in her brief. *See* TEX. R. APP. P. 38.1(g) (requiring appellant's brief to contain statements of facts "supported by record references").

[30] Zoanni quotes her counsel's argument during the charge conference in which he cited to *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002). But *Bentley* does not hold that an excessive award of actual damages, such as one that impermissibly includes punitive damages, constitutes a constitutional violation. Thus, *Bentley* does not support the proposition that an award of punitive or exemplary damages masquerading as actual damages violates the constitution. In her reply brief, Zoanni cites to *State Farm Mutual Automotive Insurance Co. v. Campbell*, 538 U.S. 408 (2003) in apparent support for her argument that the amount of actual damages awarded to Hogan amounts to a constitutional violation. In *State Farm*, the United States Supreme Court held that an award of excessive punitive damages violates the Due Process Clause of the Fourteenth Amendment. *Id.* at 429; *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568, 574–75 (1996) (articulating three guideposts

by "provid[ing] no citation to authority, nor appl[ying] applicable law to the facts of the case in support of her second issue"); *Marin Real Estate Partners, L.P.*, 373 S.W.3d at 75 ("A failure to provide substantive analysis of an issue waives the complaint.")

We overrule Zoanni's challenge to the legal sufficiency of the evidence supporting the awards of past and future mental anguish and past and future loss of reputation.

## 2. Factual Sufficiency

Zoanni argues "there is no factually sufficient evidence to support" the jury's awards of damages for past and future mental anguish and past and future loss of reputation and further that the damage awards are "manifestly too large."

Zoanni's challenges are deficient because she presents little more than conclusory assertions to support her arguments. While Zoanni identifies the factual sufficiency standard, Zoanni does not apply the standard to the facts in this case, cite to the record, identify contrary evidence, or otherwise provide a meaningful analysis of the issue. She thus waived the issue. *See* TEX. R. APP. P. 38.1(i); *Marin Real*

---

courts use to determine whether award of punitive damages is so excessive as to violate due process). The jury, however, did not award Hogan punitive damages and furthermore, to the extent Zoanni is attempting to raise a due process challenge, "a party may not present arguments for the first time in its reply brief." *Cebcor Serv. Corp. v. Landscape Design & Constr., Inc.*, 270 S.W.3d 328, 334 (Tex. App.—Dallas 2008, no pet.); *see also Yazdchi v. Bank One, Tex.*, 177 S.W.3d 399, 404 n.18 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

*Estate Partners, L.P.*, 373 S.W.3d at 75 ("A failure to provide substantive analysis of an issue waives the complaint.").[31]  Even if Zoanni had not waived her challenge to the factual sufficiency of the evidence supporting the damage awards, she still would not prevail.  Zoanni argues Hogan "damaged his own reputation" and caused his mental anguish by viewing pornography on his personal and Church computers, calling sex hotlines, engaging in other voyeuristic behavior, including attempting to spy on naked girls in the bathroom, placing himself on probation from the Church,

---

[31]  Zoanni's reply is equally deficient because her sufficiency arguments do not differentiate between the (1) awards for mental anguish and injury to reputation, (2) awards for past and future loss of reputation, or (3) awards for past and future mental anguish, and her discussion focuses on the entire amount of actual damages awarded for past and future mental anguish and past and future loss of reputation under Jury Question 10 Parts A and B.  *See Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 & n.30 (Tex. 2005) (explaining courts measure sufficiency of evidence as presented in jury charge when parties did not object).  Zoanni's reply brief thus fails to provide a meaningful and substantive analysis of these issues as presented in the jury charge.  *See* TEX. R. APP. P. 38.1(i); *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.) (holding failure to provide substantive analysis waives a complaint); *see also Patel v. Hussain*, 485 S.W.3d 153, 182 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding that global challenge to mental anguish damages that failed to separately challenge award of future mental anguish damages or cite to authority relevant to future mental anguish damages waived challenge to mental anguish damages on appeal).  Moreover, an appellant who develops her arguments for the first time in her reply waives the issue.  *See Bank of Am., N.A. v. Barth*, No. 13-08-00612-CV, 2013 WL 5676024, at *3 (Tex. App.—Corpus Christi–Edinburg Oct. 17, 2013, no pet.) (mem. op.) (holding appellant waived issue because it "developed this argument, citing to the record and authority for the first time in its reply brief"); *see also Palma v. Harris Cnty. Appraisal Review Bd.*, No. 01-17-00705-CV, 2018 WL 3355052, at *2 (Tex. App.—Houston [1st Dist.] July 10, 2018, pet. denied) (mem. op.) (holding appellant who "did not develop or properly brief his argument that he was entitled to a situs hearing until his reply brief" waived issue due to inadequate briefing).

98

and publicizing or amplifying the defamatory statements. Assuming there is evidence in the record supporting Zoanni's argument, considering such evidence in addition to the evidence discussed in our legal sufficiency analysis and weighing the evidence in neutral light, we cannot say that the jury's damage awards are "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998) (stating when conducting factual sufficiency review, courts consider and weigh all evidence in neutral light and will set aside finding only if it is "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust"). We thus conclude there is factually sufficient evidence supporting the awards of damages for past and future mental anguish and past and future loss of reputation.

Zoanni's argument that the damage awards are "manifestly too large and unjust" is equally deficient. *See id.* (stating claim that award of actual damages is excessive is factual sufficiency complaint and courts will set aside jury finding based on factually insufficient evidence if evidence is "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust"). While Zoanni identifies the factual sufficiency standard, Zoanni does not apply the standard to the facts in this case, cite to the record, identify contrary evidence, or otherwise provide a meaningful analysis of the issue based on separate way in which the damages question was presented to the jury in Question 10 Parts A and B. *See Patel*, 485

99

S.W.3d at 182 (holding appellant who "globally challenge[d] mental anguish damages and [did] not separately challenge the jury's award of future mental anguish damages or cite to authority relevant to future mental anguish damages" waived challenge to award of future mental anguish damages on appeal).

We thus overrule Zoanni's challenges in her first issue to the factual sufficiency of the evidence supporting the jury's awards for past and future mental anguish and past and future loss of reputation, including the amounts of damages awarded.

## Conclusion

We affirm the trial court's judgment. Any pending motions are denied as moot.

Veronica Rivas-Molloy
Justice

Panel consists of Chief Justice Adams and Justices Countiss and Rivas-Molloy.